LEONARD LANSBURGH and ROSANNE LANSBURGH, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Lansburgh v. Commissioner
Docket Nos. 26923-82; 26924-82; 26925-82; 26926-82.
United States Tax Court
T.C. Memo 1987-491; 1987 Tax Ct. Memo LEXIS 487; 54 T.C.M. (CCH) 691; T.C.M. (RIA) 87491; September 28, 1987. Samuel C. Ullman and Jane W. McMillan, for the petitioners. Gary F. Walker and Vera E. Gilford, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Petitioner
Docket No.
Year
Deficiency
Leonard Lansburgh
26924-82
1975
$ 21,744
1976
342,694
Leonard and
26923-82
1977
436,158
Rosanne Lansburgh
Estate of Morris
26925-82
1972
22,279
Lansburgh, Deceased,
1975
31,550
Leonard Lansburgh,
1976
124,006
Personal
1977
15,779
Representative and
Estate of Jean Lansburgh
Deceased, Leonard
Lansburgh and Morris
Lansburgh, Jr., Co-
Personal Representatives
Estate of Morris
26926-82
1978
91,919
Lansburgh, Deceased,
1979
853
Leonard Lansburgh,
Personal
Representative
All issues except those related to disallowed losses from petitioners' purchases and leasebacks *489 of computer equipment were settled prior to trial. The remaining issues for decision are: (1) whether petitioners' purchase/leaseback transactions with Greyhound Computer Corporation (GCC) had either a business purpose or economic substance; [2] (2) whether petitioners were "at risk" for purposes of section 465 during 1976 and 1977 with respect to their promissory notes to Computer Leasing Company (CLC) which converted from recourse to nonrecourse on March 1, 1978; and (3) whether petitioners are liable for an increased rate of interest pursuant to section 6621(c), Internal Revenue Code of 1986 (previously section 6621(d), Internal Revenue Code of 1954). [3]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. *490 Petitioner Leonard Lansburgh (Leonard) and Rosanne Lansburgh, husband and wife during 1977, resided in Miami, Florida at the time they filed their petition for docket No. 26923-82. Leonard resided in Miami, Florida at the time of the filing of his petition for docket No. 26924-82. Morris Lansburgh, Leonard's father, died on February 10, 1977. Jean Lansburgh (Jean), Leonard's mother, was the surviving spouse of Morris. She and Leonard were the duly appointed co-personal representatives for the Estate of Morris Lansburgh. Jean died on October 18, 1983; as a result of Jean's death, Leonard is the sole remaining personal representative of his father's estate. Leonard and his brother, Morris Lansburgh, Jr. are the personal representatives of Jean's estate. The legal address for petitioners in docket Nos. 26925-82 and 26926-82 at the time of the filing of their petitions herein was Miami, Florida. Thus, an appeal of these consolidated cases will lie in the Eleventh Circuit. The parties stipulated that in docket Nos. 26925-82 and 26926-82, the claimed losses from Morris' purchase and leaseback of computer equipment should be treated consistently with the treatment of losses *491 claimed by Leonard. Because the transaction entered into by Morris is essentially the same as Leonard's, we will focus primarily on Leonard and his transaction. Leonard is a highly successful businessman. At all relevant times he was the president of David Travels, Inc. (David Travels) and owned 92.5 percent of its outstanding stock. David Travels is in the wholesale tour business. It assembles tour package which are offered to the general public, primarily through travel agents, throughout the United States. In 1976, Leonard's income was subject to tax at the marginal rate of 70 percent. In late 1976, Leonard was informed by his accountant of a sale/leaseback transaction involving Greyhound Computer Corporation (GCC), a wholly-owned subsidiary of The Greyhound Corporation. The transaction (described in an Offering Memorandum dated December 1, 1976) involved the leverage sale of separate portfolios or units of used IBM System 360 computers together with computer peripheral equipment (the equipment) on a 6 year payment basis, and a simultaneous leaseback of the equipment for the same 6 year period. [4] Each unit of equipment sold cost $ 1.1 million. Effective as of December 1, 1976, Leonard *492 purchased two portfolios of equipment, one consisting of 3 units and another consisting of 4/10 of a unit, and Morris purchased one unit. Payment for each unit acquired was as follows: A recourse note to GCC, dated December 1,
$ 60,000
1976, bearing interest at the rate
of 7 percent per annum due on May 31,
1977
A note, dated December 1, 1976,
230,000
recourse from December 1, 1976 until
March 1, 1978, and non-recourse
thereafter, bearing interest at the
rate of 10 percent per annum, due on
November 30, 1982 (the flip/flop note) [5]
A non-recourse note to GCC, dated December 1,
810,000
1976, bearing interest at the rate
of 11.5 percent, due on November 30, 1982
Total
$ 1,100,000
In addition, $ 40,000 was required to be paid at closing. This $ 40,000 was to be applied to the interest due on each of the three notes; $ 10,029 was interest due for the month of December, 1976 *493 and the balance as prepaid 1977 interest. [6]
Leonard executed a total of six notes, as follows: Portfolio 1 (3 Units)
Recourse note to GCC
$ 180,00
Nonrecourse note to GCC
2,430,000
Flip/flop note to CLC
690,000
$ 3,300,000
Portfolio 2 (4/10 Unit)
Recourse note to GCC
$ 24,000
Nonrecourse note to GCC
324,000
Flip/flop note to CLC
92,000
440,000
$ 3,740,000
The two flip/flop notes, which are at controversy with respect to one of the issues involved herein (i.e., the "at risk" issue), were nonnegotiable but recourse from December 1, 1976 until March 1, 1978. On March 1, 1978, the notes became negotiable and if not then in arrears, they would be nonrecourse. The flip/flop notes were payable as follows: 1) Interest only *494 was due on December 30, 1976; 2) No principal payments were due prior to November 30, 1977; and 3) Beginning November 30, 1977 and thereafter will November 30, 1982, twenty-one equal quarterly installment payments of principal and interest payments were due. Each of the flip/flop notes was due and payable in full in the event Leonard failed to pay any installment of interest or principal within 20 days after the installment became due and payable and written notice and demand therefor was given. Concurrent with its purchase, the equipment was leased back to GCC for a six year period commencing December 1, 1976. GCC and Leonard entered into separate leases for each portfolio. All the equipment was subject to pre-existing leases to end users. The leases between Leonard and GCC were triple net leases, so that all maintenance, taxes and insurance costs were to be paid by GCC as lessee. After Leonard's cash payments in December, 1976 and May, 1977, the rentals received from GCC were sufficient to amortize in full his remaining obligations to GCC. The following schedule sets forth the rental payments due Leonard and the note payments (principal and interest) due by him *495 to GCC and CLC. 2/28/78 and
quarterly
thereafter
through
12/76
5/31/77
11/30/77
11/30/82
20 qtrs
$ 3,300,00 Trans-
action (3 units)
Rental due from
G C C
-0-
$ 80,298    $ 80,298 $ 211,282.50 $ 180,000 Note
to G C C
* $ ( 1,050)
* (185,250)   -0-
-0-
$ 2,430,000 Note
to G C C
* (67,200)
(80,298)   (37,665)
(164,149.50)
$ 690,000 Note
to C L C
* (51,750)
-0-
(42,633)
( 42,633.00)
$ 440,000 Trans-
action (.4 units)
Rental due from
G C C
-0-
10,706.40 10,706.40 28,171.00 $ 24,000 Note to
G C C
* ( 140)
* (24,700)   -0-
-0-
$ 324,000 Note to
G C C
* (8,960)
(10,706.40)
( 5,022)
( 21,886.60)
$ 92,000 Note to
C L C
* ( 6,900)
-0-
(5,684.40)
( 5,684.40)
$ (136,000)
$ (209,950)   -0-
$ 5,100    x 20 qtrs.    ** 102,000    11/30/82
balloon
$ 3,300,00 Trans-
action (3 units)
Rental due from
G C C
-0-
$ 180,000 Note
to G C C
-0-
$ 2,430,000 Note
to G C C
$ (90,000)
$ 690,000 Note
to C L C
-0-
$ 440,000 Trans-
action (.4 units)
Rental due from
G C C
-0-
$ 24,000 Note to
G C C
-0-
$ 324,000 Note to
G C C
(12,000)
$ 92,000 Note to
C L C
-0- ** (102,000)
*496 Without considering tax benefits, Leonard was out-of-pocket $ 345,950 at the end of the lease term. All rental payments due Leonard by GCC were paid to two accounts maintained by him at the First National Bank of Arizona (the Bank). The Bank made all note payments payable by Leonard to GCC and CLC. Leonard received advices of deposits and withdrawals from the Bank evidencing rental payments received and note payments made. He wrote checks from the Bank accounts to himself for the difference between rental payments received and note payments made. All rental payments were timely received; all note payments were timely made. The leases gave GCC the right to sell equipment which was not being leased to an end user and to substitute therefor other equipment with a fair market value at least equal to the fair market value of the original equipment. The lease also provided that any pre-existing *497 option of a sublessee to purchase the equipment from GCC would be preserved; upon exercise of such an option by a sublessee, GCC was required to substitute for Leonard's equipment other equipment of substantially equal value as the equipment purchased by the sublessee. On several occasions, substitutions of the equipment were made by GCC. In each case, the substituted equipment was of equal or greater fair market value as the original equipment. The leases required GCC to return the equipment to Leonard on November 30, 1982. However, Leonard simultaneously executed a supplemental agreement with GCC, which contemplated various alternative methods of disposing of the equipment upon the expiration of the leases. This agreement provided that if Leonard, upon expiration of the lease with GCC, decided to sell the equipment other than by his own efforts, he would appoint GCC as his sales agent. In return, GCC would receive a percentage of the net sales proceeds. [7] The percentage payable to GCC increased as the amount of net sales proceeds increased; the maximum amount payable to GCC was 50 percent, applicable to sales proceeds in excess of $ 476,000. [8]
*498 Pursuant to the supplemental agreement, if Leonard decided to sell the equipment using his own efforts upon the expiration of the lease, GCC had the option to purchase the equipment at its fair market value. In addition, Leonard had the right to compel GCC to make such a purchase. Fair market value included the present value of all non-cancellable rental due by any sublessees of the equipment. The purchase price was adjustable, however, in order to compensate GCC "for the enhancement in value of the Equipment resulting from any existing leases on the Equipment negotiated and obtained by [GCC] at its own expense." [9]
If Leonard did not sell the equipment to GCC upon expiration of the lease, Leonard and GCC agreed to use their best efforts to negotiate a working relationship in order to facilitate disposal of the equipment, and to provide compensation to GCC to be determined at that time for its service as sales agent. In the absence of a working relationship, the parties agreed that Leonard *499 would pay 33-1/3 percent of the present value of all non-cancellable rents due under any continuing subleases of the equipment, and 33-1/3 percent of any other amounts (e.g., sales proceeds) received from sublessees pursuant to their sublease agreements. GCC provided Leonard, at its own expense, with a written appraisal prepared by Thomas J. Norris stating that the equipment had a value equal to its purchase price (i.e., $ 3,740,000), that its residual value at the end of 6 years was $ 560,000 (15% of the purchase price) and that its useful life was 8 years. During the first several years, including the years in issue, the transactions generated substantial tax losses which Leonard used to offset income which otherwise would have been subject to tax at the marginal rate of 70 percent. During the years at issue, the amount of taxes saved by Leonard by utilizing these losses exceeded the amount of his payments to GCC. [10] By the end of the lease term (November 30, 1982), however, there was a cumulative negative after-tax cash flow. The only way of realizing a profit was if the residual value of the equiment exceeded $ 345,950 (Leonard's out-of-pocket cash), which approximated *500 9.3 percent of the purchase price ($ 3,7400,000) for the equipment. The Offering Memorandum did not predict what the residual value of the equipment would be at the expiration of the lease term. It noted that obsolescence of the equipment would reduce its residual value, and that IBM in 1971 had shipped a newer model of computer equipment, known as the System 370 series, which IBM represented as a significant improvement over the System 360 equipment. [11] Most of the System 360 peripheral equipment and software, however, could be sued on the *501 System 370 equipment. IBM had first delivered the System 3700 six years after the initial (1965) deliveries of the System 360; the system 360 series had, in turn, first been delivered six years after the delivery of IBM's previous series. Therefore, delivery of a new series of computers after the System 370 series could, according to the Offering Memorandum, be anticipated within a similar time period. In fact, during the early 1970's, internal IBM documents had indicated a plan for a new series of computer called the Future System (FS). It was generally known in the industry that the FS was expected to be a dramatic departure from earlier IBM trends. However, by May, 1975, many in the field believed that IBM was going to cancel the FS program. By the end of 1975, it was clear that IBM had abandoned the FS and that future changes in IBM's product lines would be "evolutionary" rather than "revolutionary." Prior to entering into the transaction with GCC, Leonard requested Paul Franzelas, the data processing manager employed by David Travels, to assist him in evaluating the proposed transaction. Mr. Franzelas *502 contacted various brokers and dealers in used computer equipment, and he informed Leonard that the proposed purchase price for the equipment approximated its fair market value. Mr. Franzelas also contacted various end users of the equipment and he informed Leonard that all businesses contacted stated that they were using the equipment and intended to continue to do so. Leonard also contacted a friend, Jack Cohen, at that time an officer within The Greyhound group. Mr. Cohen contacted a person at GCC who had structured the transaction, and he informed Leonard that the proposed transaction was legitimate. Numerous expert witnesses testified (three for respondent, three for petitioners) as to the fair market and/or residual value of the computer equipment. Their opinions can be summarized as follows: Fair Market Value
November 30, 1982
Petitioner's Witnesses
As of December, 1976
Projected Residual Value
Svend Hartmann
$ 3,578,000
$ 198,000 - 1,216,000
Thomas Norris
3,740,000
560,000
Robert Djurdjevic
3,062,425
633,900
Respondent's Witnesses
Dee Morgan
$ 2,376,300
$ 108,978
Jeffrey Klein
1,365,000
gave no opinion
Richard Hubbell
3,000,000
100,000
*503 Respondent contends that the purchase/leaseback transaction was a tax avoidance scheme without economic substance; in essence, respondent contends that the transaction should not be respected for tax purposes. Respondent also contends that petitioners were not "at risk" within the meaning of section 465 on the flip/flop notes. Finally, respondent seeks imposition of an increased rate of interest pursuant to section 6621(c), Internal Revenue Code of 1986. ULTIMATE FINDINGS OF FACT Leonard entered into the purchase/leaseback transaction with GCC with the predominant purpose and intent to make a profit. The price paid by Leonard for the equipment approximated its fair market value at the time of acquisition in December, 1976. The transaction had economic substance in that it afforded Leonard a realistic opportunity for economic profit exclusive of tax benefits. OPINION This is yet another case wherein we must determine whether a sale/leaseback transaction involving computer equipment should be respected for Federal tax purposes. See Bussing v. Commissioner,88 T.C. 449 (filed February 23, 1987); Gefen v. Commissioner,87 T.C. 1471 (1986); *504 Mukerji v. Commissioner,87 T.C. 926 (1986); James v. Commissioner,87 T.C. 905 (1986); Coleman v. Commissioner,87 T.C. 178 (1986); Estate of Thomas v. Commissioner,84 T.C. 412 (1985). The transaction involved herein is similar to that in a recently decided Memorandum Opinion, L. W. Hardy Co. v. Commissioner,T.C. Memo. 1987-63. No useful purpose would be served by reciting herein the facts and holdings of each of the aforementioned cases. Suffice to say, a sale/leaseback transaction will be respected for Federal tax purposes, if aside from tax benefits, the transaction has economic substance. Respondent contends that Leonard entered into the sale/leaseback transactions with GCC solely to obtain tax benefits. In support of this contention, respondent argues that Leonard paid more for the equipment than its fair market value and that the realistically could not obtain a profit. We disagree. The existence of tax benefits does not deprive a transaction of either a business purpose or economic substance ( Estate of Thomas v. Commissioner,84 T.C. 412, 432 (1985)), since it is *505 well recognized that business transactions are frequently shaped (at least in part) by tax considerations. Frank Lyon Co. v. United States,435 U.S. 561, 580 (1978). We believe the transactions entered into by Leonard were not solely or even primarily tax motivated, but rather were entered into in order to obtain a profit. Leonard impressed us as an astute businessman; he was a credible witness. He realised that by the end of the lease term, there would be a cumulative negative after-tax cash flow; hence, tax benefits alone would not make the transactions profitable. The transactions were profitable only if the equipment's residual value at the end of the leases was more than $ 345,950, which in our opinion, Leonard believed would be the case. Before purchasing the equipment, Leonard inquired into the legitimacy of the deal. First, he had the data processing manager of David Travels (Paul Franzelas) contact various dealers in used computer equipment and sublessees of the equipment; Mr. Franzelas determined that the proposed purchase price for the equipment approximated its fair market value and that the sublessees of the equipment were using it and intended *506 to continue to do so. Then, Leonard contacted a friend who was an officer within The Greyhound group (Jack Cohen) who verified that the transaction was legitimate. Finally, Leonard reviewed Mr. Norris' appraisal of the current fair market value of the equipment and its expected residual value at the end of the six year lease term. Respondent would have Leonard do more -- respondent claims that Leonard should have hired his own appraiser prior to entering into the transaction. This is hardly the norm in business transactions such as this. Further, we are not convinced that the equipment would have been appraised for an amount substantially less than the purchase price. Determining fair market value of used computer equipment is not an exact science. It is not unusual for experts giving after the fact appraisals to differ in opining on value, as evidence by the opinions expressed by petitioners' and respondent's experts in this case. Here, those opinions ranged from $ 1,365,000 to $ 3,740,000 as to the value of the equipment in December, 1976, and ranged from $ 100,000 to $ 1,216,000 as to the projected residual value on November 30, 1982. We find credible Leonard's testimony *507 that after speaking with Paul Franzelas and Jack Cohen, he believed that he paid a fair price for the equipment. Furthermore, we think that Leonard's belief was justifiable. The most persuasive of the six experts who testified was Svend E. Hartmann. Mr. Hartmann is the president of Computer Merchants, Inc. (Computer Merchants), which is a dealer and lessor of IBM computer equipment. He is also the editor of the Computer Price Guide, and the author of a quarterly newsletter, the Readers Report, which is a supplement to the Computer Price Guide. The Computer Price Guide was the computer industry's first regularly published source of price and market information for both new and used computer equipment. It is widely used by computer professionals and others who have a continuing need to remain informed about price trends and development in the marketplace for IBM computer. Within the computer industry, it is commonly referred to as the "Blue Book" of prices for used computers. The Computer Price Guide is published quarterly in January, April, July and October. Mr. Hartmann appraised Leonard's equipment as of December 1, 1976. At that time, the October, 1976 issue of the *508 Computer Price Guide had been published; the January, 1977 issue was not yet available. By the time Mr. Hartmann prepared his expert report, however, the January, 1977 issue of the Computer Price Guide (which reflected a 9.6 percent decline in the value of Leonard's equipment portfolio since October, 1976) was available. In order to more accurately determine the price of the equipment as of December 1, 1976, Mr. Hartmann interpolated between the prices shown on the October, 1976 issue of the Computer Price Guide and those on the January, 1977 issue. The value he thereby derived was $ 3,252,210. He then adjusted this value to reflect the enhanced value of the equipment due to the pre-existing leases of the equipment to end users. Because leases of the equipment were already in place, according to Mr. Hartmann, Leonard saved delivery and installation costs, and benefited from GCC's previous success in leasing the equipment to unrelated end users. After taking a 10 percent lease premium into account, Mr. Hartmann appraised the equipment at $ 3,578,000, which is 96 percent of the amount Leonard had agreed to pay GCC for the equipment. Mr. Hartmann also estimated, as of 1976, the *509 residual value an investor could expect the equipment to have in 1982 when the lease with GCC expired. Mr. Hartmann first estimated a range of useful lives for the various components in Leonard's equipment portfolio. Then, assuming gradual decline in the value of the portfolio as a whole, he estimated a range of residual values for the portfolio as a whole was from $ 198,000 to $ 1,216,000, or from 5.3 percent to 33 percent of the purchase price. We find Mr. Hartmann's estimates of the fair market value of the equipment and its residual value reasonable. We agree that a lease premium should be taken into account in arriving at fair market value, and we approve of Mr. Hartmann's use of both the October, 1976 and January, 1977 issues of the Computer Price Guide in arriving at his estimate of fair market value. Mukerji v. Commissioner, supra.
We are satisfied that the amount Leonard agreed to pay for his equipment approximated its fair market value; therefore, we reject respondent's argument that Leonard's notes were invalid. We are also convinced that Leonard, in 1976, could reasonably expect the equipment to have a residual value in 1982 sufficient to make *510 the transaction profitable. This situation is unlike other cases in which we found that even if the most optimistic anticipated residual value could be obtained, no net profit would result. See James v. Commissioner, supra.Leonard's expectation that the equipment would yield the 9.3 percent residual value necessary to break even on the GCC transaction was a modest one, which we believe was obtainable. Thus, we hold that Leonard had a valid business purpose for entering into the purchase/leaseback transaction with GCC and that the transaction had economic sustance. Finding that Leonard's purchase/leaseback transaction is to be respected for tax purposes, we now must decide whether Leonard was "at risk" within the meaning of section 465 on the flip-flop notes. Section 465(a) limits the deductibility of losses arising from certain activities, including the leasing of section 1245 property, such as here involved, to the amount for which the taxpayer is at risk for such activity at the close of the taxable year. In general, an individual is at risk for the amount of money invested in the leasing activity, together with amounts borrowed with respect thereto, if *511 he is personally liable for repayment of those liabilities. An individual is not at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements or other similar arrangements. Section 465(b). In Porreca v. Commissioner,86 T.C. 821 (1986), we held that a taxpayer was not at risk with respect to the principal amounts due under a recourse note which converted to nonrecourse at the end of five years, where during the 5 year recourse period, only minimal noncontingent interest payments were required (with other payments being contingent on the proceeds of the underlying activity) and the conversion from recourse to nonrecourse was activated by the passage of time and with payment of a nominal fee (with the right to make up any deliquent payments). Applying a facts-and-circumstances test, we found that the parties did not intend that the note be truly recourse, but rather that the taxpayer be protected against loss. The situation in this case differs from that in Porreca v. Commissioner. Although, as in Porreca, the conversion of Leonard's notes from recourse to nonrecourse was not tied to a substantial *512 economic event [12] (but rather occurred upon the passage of time), substantial amounts of principal and interest on the flip/flop notes were not only due but were in fact paid. The notes involved herein could be converted from recourse to nonrecourse only if they were not in arrears at the time of conversion, there was no right to make up any delinquencies, and payment of the notes was not contingent on the proceeds from the underlying activity. Because of these differences, we reach a result herein different from Porreca. Accordingly, we believe that Leonard was at risk as of December, 1976, and at all relevant times thereafter, with respect to the flip/flop notes to the extent, and only to the extent, of the sum of the interest payments and the two fixed quarterly principal payments due thereon from December, 1976 to February 28, 1978. [13]
*513 Respondent argues that through the tax benefits generated by the sale/leaseback transaction, Leonard was never truly at risk because he could use the tax benefits to pay his flip/flop liabilities during the recourse period (December, 1976 - February, 1978). This, alleges respondent, constitutes an additional guarantee or "other similar arrangement" under section 465(b)(4). We do not believe that potential tax deductions constitute a "guarantee" or "other similar arrangement" within the meaning of section 465(b)(4). Thus, we reject respondent's argument. [14]
Respondent further argues that CLC is a mere nominee of The Greyhound Corporation as payee on the flip/flop notes and that Greyhound had an interest in the transaction other than as a creditor. There is nothing in the record to indicate that CLC was a nominee of The Greyhound Corporation; nor do we have any reason to disregard the existence of CLC as a separate corporate entity. Thus, we reject this argument. [15] See Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943). *514 Respondent asserts that an increased rate of interest applies, pursuant to section 6621(c) of the Internal Revenue Code of 1986 (previously section 6621(d) of the Internal Revenue Code of 1954). Section 6621(c) provides that interest which accrues after December 31, 1984 on a substantial underpayment attributable to a tax motivated transaction shall be 120 percent of the underpayment rate. Section 6621(c) applies only if a tax motivated transaction results in an underpayment in excess of $ 1,000. Section 6621(c)(2). A "tax motivated transaction" includes, among other things, any loss disallowed by reason of section 465(a). Section 6621(c)(3)(A)(ii); section 301.6621-2T, A-2(2), Temp. Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). We have decided that Leonard was not at risk with respect to the entire amount due on the flip/flop notes; that decision will undoubtedly result in an underpayment in excess of $ 1,000. Thus, the increased rate of interest pursuant to section 6621(c) applies. [16]
*515 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Leonard Lansburgh, docket No. 26924-82; Estate of Morris Lansburgh, Deceased, Leonard Lansburgh, Personal Representative, and Estate of Jean Lansburgh, deceased, Leonard Lansburgh and Morris Lansburgh, Jr., Co-Personal Representatives, docket No. 26925-82; and Estate of Morris Lansburgh, Deceased, Leonard Lansburgh, Personal Representative, docket No. 26926-82. ↩
2. Resolution of the this issue will also determine the amount of allowable medical expenses claimed by petitioners in docket No. 29625-82 for 1977. ↩
3. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and as in effect during the taxable years in issue. ↩
4. The aggregate purported value of the equipment offered for sale by GCC was $ 33 million. ↩
5. This note was payable to Computer Leasing Company (CLC), a wholly owned subsidiary of GCC. ↩
6. The Offering Memorandum stated that the total "equity" required to purchase $ 1.1 million of equipment was $ 100,000 ($ 40,000 payable in December, 1976 and $ 60,000 payable on the note to GCC due May 31, 1977). The amount of "equity" per unit was recalculated later in the Offering Memorandum to be $ 101,750, representing the aforesaid $ 40,000 and $ 60,000 amounts plus interest of $ 1,750 on the $ 60,000 note. ↩
*. The total of all payments made less the total of all payments received was $ 345,950. ** The amount of the balloon payment due on November 30, 1982 equaled the excess rentals received from February 28, 1978 - November 30, 1982 over the note payments due during that same time period. ↩
7. "Net proceeds" was defined as the gross selling price less any expenses, including (but not limited to) legal and accounting expenses, installation, insurance and transportation expenses, and repair, improvement and modification expenses. ↩
8. According to the Offering Memorandum, the percentage payable to GCC for each unit was: nothing for sales proceeds from 0 - $ 100,000, 25 percent for sales proceeds from $ 100,001 - $ 140,000, and 50 percent for sales proceeds over $ 140,000. For Leonard's purchase of 3.4 units, the percentage payable to GCC was: nothing for the sales proceeds of 0 - $ 340,000, 25 percent for sales proceeds of $ 340,001 - $ 476,000, and 50 percent for sales proceeds in exceed of $ 476,000. ↩
9. The adjustment would be a reduction in purchase price equal to 33-1/3 percent of the present value of all non-cancellable rents due under any continuing subleases of the equipment. ↩
10. The Offering Memorandum contained a schedule showing the anticipated economic effects on individuals taxpayers in the 70% tax bracket. That schedule showed that a taxpayer in the 70% tax bracket who purchased one unit would obtain a substantial after-tax cash flow (i.e., tax savings in excess of cash payments) in 1976 and 1977, a minimal positive after-tax cash flow in 1978, 1979 and 1980, a minimal negative after-tax cash flow in 1981 and a substantial negative after-tax cash flow in 1982. The cumulative effect would be that such a taxpayer would have an overall negative after-tax cash flow of $ 39,025 for each unit purchased. ↩
11. A newer version of the System 370 had been shipped in 1973. ↩
12. The House and Senate Committee reports indicate that if a recourse note converts to nonrecourse upon the happening of a substantial economic event (e.g., a motion picture reaches a certain stage of completion or generates a certain level of box office receipts or an orchard reaches a certain stage of development), then the note constitutes an amount at risk during the period it was with recourse. H.Rep. 94-658, at 110 (1976), 1976-3 C.B. (Vol. 2) 701, 802 n.10; S.Rep. 94-938 at 48 (1976), 1976-3 C.B. (Vol. 3) 49, 86 n.1. ↩
13. Upon payment of such sum and with the passage of time, the notes became nonrecourse; thus, the liability for payments on the flip/flop notes after their conversion does not constitute an amount at risk. ↩
14. See footnote 15, infra.↩
15. Both of these arguments were made in respondent's supplemental brief, requested in order to discuss another matter. Petitioners objected to our considering these arguments because they "are outside the scope of the Court's Order and represent an unfair attack to which Petitioners have no opportunity to respond." Notwithstanding that petitioners' objection has merit, we have decided to both discuss these arguments and to reject them. ↩
16. Petitioners in docket Nos. 26925-82 and 26926-82 will also be liable for the increased rate of interest pursuant to section 6621(c)↩.