FREDERICK B. OFFERMANN AND JANE S. OFFERMANN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Offermann v. Commissioner
Docket No. 10678-85.
United States Tax Court
T.C. Memo 1988-236; 1988 Tax Ct. Memo LEXIS 265; 55 T.C.M. (CCH) 955; T.C.M. (RIA) 88236; May 26, 1988. Jon T. Flask and Donald Geerhart, for the petitioners. Wilton A. Baker, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax for the years and in the amounts as follows: Year Ending
Deficiency
Sec. 6653(a)(1) [1], (a)(2)
Sec. 6659 [2]
December 31, 1981
$ 10,464.00
$ 523.30
*
2,672.10
December 31, 1982
14,970.00
748.50
*
3,137.40
December 31, 1983
11,348.00
567.40
*
2,684.10
*268 Respondent also determined that petitioners were liable under section 6621(c)[3], for each of the years in issue for the additional interest on substantial underpayments of tax attributable to tax motivated transactions. In the alternative to the section 6659 determination, respondent determined that petitioners were liable under section 6661 for the 10-percent addition to tax for a substantial understatement of tax for taxable years 1982 and 1983. The issues for decision are: (1) Whether the sale/leaseback transaction entered into by petitioners should be disregarded for Federal *269 income tax purposes because it lacked economic substance and profit motive; (2) If the transaction is not to be disregarded for income tax purposes, are the losses claimed by petitioners limited under the at-risk provisions of section 465; and (3) Whether petitioners are liable for additions to tax under sections 6653(a)(1) and (a)(2), 6621(c), and 6661. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Potomac, Maryland at the time of the filing of the petition in this case, filed joint Federal income tax returns for the calendar years 1981, 1982, and 1983, wit the Internal Revenue Service Center in Philadelphia, Pennsylvania. Frederick S. Offermann (petitioner) received a degree in engineering science from Johns Hopkins University in 1956. Subsequently, he took graduate courses in electrical engineering at the University of Pennsylvania and received a Masters of Business Administration (M.B.A.) from Harvard Business School in 1963. Petitioner has also taken courses on topics such as computer products available on the market, the comparative advantages of leasing versus purchasing computer *270 equipment, and IBM product development. Petitioner's employment experience prior to the time he attended Harvard Business School included working as a research engineer for Remington Rand; teaching electrical engineering courses while in the military; and working as an application engineer for Westinghouse. After receiving his master's of business administration degree (M.B.A.) petitioner worked as marketing manager for GPS Instrument Company and in marketing for Raytheon Computer. Commencing in January of 1967, petitioner worked for International Business Machines Company (IBM) for about 15 years. His experience with IBM was in marketing digital computers. His work there required him to be knowledgeable not only of IBM products and their price and performance, but of competitive products as well. Beginning in August of 1980 petitioner was employed as a leasing salesman by St. Joseph Leasing Corporation (Leasing). In this capacity petitioner dealt with computer users in an attempt to persuade them to finance their computer equipment through leases wit Leasing. Petitioner was employed by Leasing throughout the years here in issue. On December 31, 1981, petitioner purchased *271 from St. Joseph Equity Corporation (Equity) the computer equipment listed below which was manufactured by IBM and Intel Corporation (Intel). Machine or Feature
Original cost
IBM 3271
8 units
$  25,120
3250
8 units
3,776
7821
8 units
704
Intel 3815
1 unit
96,600
5910
1 unit
13,800
Total cost
$ 140,000
The purchase price of $ 140,000 was reasonable and not in excess of the fair market value of the equipment purchased. [4]
The St. Joseph companies (the companies) were set up in 1978 as subsidiaries of St. Joseph Bank & Trust Company of South Bend, Indiana. The companies engaged in lease financing of computer equipment for corporations and also managed their own portfolios of lease transactions and the equipment leasing portfolios of investor-owners such as petitioner. The companies were comprised of St. Joseph Lease Capital Corporation (Capital) and its two wholly-owned subsidiaries, Leasing and Equity. Because the companies were subsidiaries of a bank holding company they were subject to Government regulation. Among *272 the activities the Government prohibited was the companies' purchase of equipment not subject to an existing lease. Therefore, while the companies could not purchase equipment for inventory, they were allowed to enter into the functional equivalent of loan transactions by extending credit via lease agreements. As the operating corporation, Leasing set up the leases with the end users of computer equipment. Leasing obtained the majority of its purchase financing through loan agreements with commercial banks, pension funds or insurance companies (the lenders or lender). It would then assign the income stream generated by the end-user lease to the lenders to repay its indebtedness and concurrently grant the lender a perfected security interest. The remaining financing for the computer equipment purchase was obtained from Equity. Equity retained title to the equipment during the lease term or entered into sale/leaseback transactions with investor-owners such as petitioner. On May 14, 1980, Leasing entered into a Master Lease Agreement (Master Lease) under which it would, from time to time, during the lease term, lease certain computer equipment to American Sterilizer Company *273 (AMSCO). The specific equipment and the terms and conditions of the lease were to be specified in Equipment Lease Schedules (Equipment Schedules) which were to be executed from time to time by the parties. On July 6, 1981, Leasing and AMSCO entered into Equipment Schedule Nine which provided for the lease to AMSCO of the IBM equipment which petitioner subsequently purchased. On August 24, 1981, Leasing and AMSCO entered into Equipment Schedule Eleven which provided for the lease to AMSCO of the Intel equipment subsequently purchased by petitioner. The lease terms provided the end-user lessee AMSCO with both upgrade and cancellation options. Prior to December of 1981 petitioner's investment experience had been limited to stocks, bonds and mutual funds; second mortgages; and the purchase of five pinball machines. In the summer of 1981 petitioner first saw projections on Equity equipment investment and in October he began discussions about a possible acquisition. In his sales capacity for Leasing petitioner was not involved in selling equipment to investors. To avoid any conflict of interest, petitioner was not allowed to invest in any equipment which he had leased to customers *274 of Leasing. Petitioner was aware that central processing units (CPUs) became obsolete, losing their economic value much more rapidly than peripheral equipment. He considered this fact in his decision to invest only in peripheral equipment and told Leasing that he had no interest in acquiring CPUs. In early December 1981 petitioner was presented with an opportunity to invest in equipment, specifically in the Intel 3815 solid state memory drum and 8 IBM 3271 communications controllers, which were on lease to AMSCO. Leasing suggested the AMSCO equipment because it fit into petitioner's investment range of $ 140,000. Petitioner, relying on his experience in the computer industry, analyzed this potential investment by examining AMSCO's financial stability, considering the IBM product comparable to the Intel 3815 and consulting several friends at Leasing and discussed the equipment with officials at AMSCO. On the basis of his knowledge of computer equipment and the information he obtained, petitioner concluded that the IBM 3271s would decline in value at a greater rate than the Intel 3815 since it was unlikely that IBM would introduce a replacement product for the Intel 3815. *275 Petitioner, based on his experience in the computer industry, made an estimate of the residual values of the equipment at the end of the lease term in 1989. Based on his expectations that the IBM equipment would decline in value by 25 percent per year and the Intel equipment by 15 percent per year, petitioner concluded that the IBM 3271s had a 1989 residual value of $ 3,000 and the Intel 3815 had a 1989 residual value of $ 30,000. Petitioner did not request an appraisal of the equipment from Leasing. It was petitioner's opinion that he did not need such an appraisal because of the knowledge of value he had from his experience in the computer industry and his discussions with others at Leasing and AMSCO. On December 31, 1981, petitioner purchased the above described Intel 3815 disk drum and the eight IBM 3271 controllers which were subject to the Master Lease between Leasing and AMSCO. The "Purchase Agreement" provided for a purchase price of $ 140,000 payable as follows: zero dollars down; a nonrecourse Installment Note in the amount of $ 125,600; and a Promissory Note and Security Agreement in the amount of $ 14,400. The nonrecourse Installment Note required monthly payments *276 of $ 2,227.04 commencing on January 1, 1982, and a final payment in the amount of $ 2,227.74 on December 1, 1989. The note further provided: Seller agrees, for itself and its successors and assigns and any holder hereof, that notwithstanding anything to the contrary contained herein (a) the Buyer's Obligations shall be satisfied solely out of the rentals and other sums payable under any lease of the Equipment securing this Installment Note, or any other use or sale of the Collateral, and (b) the Seller shall have no right to satisfy any of the Buyer's Obligations out of any other property of the Buyer, provided that nothing shall prevent the Seller from exercising its rights with respect to the Collateral in the event of nonpayment of the Obligations. The Purchase Agreement included a nonexclusive remarketing agreement. That agreement provided that Equity would receive for its remarketing services a remarketing fee of -- fifty percent (50%) of any and all sums received from the use or sale of the Equipment which are in excess of the Buyer's remaining net investment in the Equipment. * * * Remarketing services, as used herein, shall include, but shall not be limited to, renewal *277 rentals payable under the Lease, the purchase of the Equipment by the Lessee or the referral of a willing lessee or a willing buyer for the Equipment to the Buyer at its then fair market or fair rental value, as the case may be. * * * Equity included this provision to allow an investor-owner to remarket the equipment himself if Equity's efforts to do so were not to his liking. This gave an investor-owner the opportunity to obtain the greatest possible return on his investment. Petitioner was familiar with this remarketing provision when he signed the Purchase Agreement. It was petitioner's intent to remarket the equipment himself. Petitioner concluded that Equity in effect retained a right of first refusal of the equipment at the termination of the lease as a means of protecting its and user AMSCO should AMSCO want to purchase or release the equipment. The $ 14,400 Promissory Note and Security Agreement required installment payments as follows: Payment
Payment
Amount to
Amount to
Outstanding
Date
Amount
Interest
Principal
Balance
12/25/82
$  5,904.00
$ 2,304.00
$ 3,600.00
$ 10,800.00
12/25/83
5,328.00
1,728.00
3,600.00
7,200.00
12/25/84
4,752.00
1,152.00
3,600.00
3,600.00
12/25/85
4,176.00
576.00
3,600.00
0   Grand
Total
$ 20,160.00
$ 5,760.00
$ 14,400.00
*278 Petitioner made timely payments on the Promissory Note and thus had total out-of-pocket principal expenditures of $ 14,400. Also on December 31, 1981, the following transactions were entered: 1. Leasing as "Lessor" assigned all its right, title and interest under the Master Lease with AMSCO to Equity as "Assignee". 2. Equity as "Assignor" assigned all its right, title and interest under the Master Lease to petitioner as "Assignee", as security for the payment of rent due under a Lease Agreement between petitioner as "Lessor" and Equity as "Lessee." 3. Petitioner as "Assignor" assigned to Equity all his right, title and interest in the Master Lease as security for "the payment * * * of the balance due in connection with its acquisition of the property subject to the Master Lease under an Installment Note and Security Agreement between the Assignor, as Buyer, and the Assignee [Equity], as Seller." 4. Petitioner as "Lessor" leased the computer equipment he had purchased from Equity back to Equity as "Lessee" for a lease term of 96 months at a rent of $ 2,275.04 peer month. The "Lease" provided Equity with substitution, termination, purchase and exchange options. Equity's *279 purpose for including these provisions was to parallel the provisions in the Master Lease between Leasing and AMSCO so that terms and conditions provided to AMSCO as end user in that lease were retained by Equity as Lessee in the "Lease" with petitioner. 5. Petitioner as "Lessor" assigned to Equity as "Assignee" all his right, title and interest, but none of the Lessor's obligations, under the "Lease" agreement. The Assignment was given as "security for the payment by Lessor [petitioner] to Assignee [Equity] * * * of the balance due in connection with its acquisition of the Equipment subject to the Lease under an Installment Note and a Security Agreement between Lessor as Buyer, and Assignee, as Seller, * * *." On December 15, 1982, petitioner as "Buyer" and Equity as "Seller" executed an Amendment to the Installment Note and Security Agreement of December 31, 1981 ("Amendment"), whereby certain of petitioner's nonrecourse obligations on the following dates were to become recourse obligations. The Amendment stated specifically: The Buyer and Seller agree to amend the above referenced Installment Note and Security Agreement as follows: 1. The Buyer and Seller hereby *280 agree to amend the above referenced Installment Note and Security Agreement such that the definition of the Buyer's Obligations, as such is used solely in the paragraph contained on page four of the Installment Note and Security Agreement which commences with the following phrase: "Seller agrees, for itself and its successors and assigns . . .", shall no longer mean: "All liabilities of the Buyer to the Seller arising under the installment Note and Security Agreement" but shall instead mean: "all liabilities of the Buyer to the Seller which are in excess of the following amounts on and continuing after the specified date: December 15, 1981
$  7,000
December 15, 1982
$ 29,000
December 15, 1983
$ 50,000
December 15, 1984
$ 68,000
December 15, 1985
$ 84,000
December 15, 1986
$ 68,000
December 15, 1987
$ 49,000
December 15, 1988
$ 27,000
December 15, 1989
$  2,000
(which amounts, as applicable, are hereinafter referred to as the "Buyer's Recourse Obligation"), arising under the Installment Note and Security Agreement." 2. In consideration of the Buyer entering into this Amendment and agreeing to be fully liable on a recourse basis for he *281 Buyer's Recourse Obligation under the above referenced Installment Note and Security Agreement, the Seller and its Assignee: (i) reconfirm for the benefit of the Buyer, as regards that portion of the Buyer's Obligations which are in excess of the Buyer's Recourse Obligation, that: (a) such excess Obligations shall be satisfied solely out of the rentals and other sums payable under any lease of the Equipment securing this Installment Note, or any other use or sale of the Collateral; and (b) the Seller shall have no right to satisfy any of the Buyer's excess Obligations under the Installment Note or Security Agreement out of any other property of the Buyer, provided that nothing shall prevent the Seller from exercising its rights with respect to the Collateral in the event of nonpayment of such excess Obligations; and (ii) agree that if either: (a) the corporate bond rating of the lessee to whom the Seller is leasing the Equipment as published by Moody's Investors Service, Inc. falls below such lessee's rating as of the Commencement Date of the Original Term of the Lease; or (b) the net worth of the lessee to whom the Seller is leasing the Equipment falls below such lessee's net *282 worth as set forth in the most recent audited financial statement available as of the Commencement Date of the Original Term of the Lease, the Buyer may rescind this Amendment, in whole or in part, by tendering written notice to the Seller by registered mail, return receipt requested. 3. All other terms and conditions of the above referenced Installment Note and Security Agreement remain unchanged. Petitioner was aware that the installment note could be assigned to a third party. In early December 1981 petitioner received and reviewed a projected profit-loss statement from Equity. This was the only document which petitioner reviewed concerning the at-risk provisions. A footnote to the projection referred specifically to the at-risk provisions of section 465. It stated as follows: The at-risk rules limit a taxpayer's loss to the amount that the taxpayer has at risk and could actually lose from an activity. These rules apply to individuals, tax-option corporations and personal holding companies. Accordingly, in order to prevent the at-risk limits from applying to the losses shown, up to $ 83,480 of the non-recourse installment note must be converted to full recourse *283 status in years 1982 through 1985. This full recourse portion will then fully amortize by 1989. During the years 1981-1985 the profit-loss statement with respect to the equipment purchased by petitioner projected the following amounts: Pre-Tax
Rental
Interest
Income
Tax
Cash
After Tax
Year
Income
Expense
Depreciation
or (Loss)
Savings
Flow
Cash Flow
1981
$       $     $ 21,000
$ (21,000)
$ 10,500
$    $ 10,500
1982
27,300
16,535
30,800
(20,035)
10,018
576
10,594
1983
27,300
16,637
29,400
(18,737)
9,369
576
9,945
1984
27,300
15,015
29,400
(17,115)
8,558
576
9,134
1985
27,300
13,133
29,400
(15,233)
7,617
576
8,193
By maintaining contact wit AMSCO about his equipment's performance petitioner learned that the Intel equipment had been upgraded by AMSCO and that the original CPU to which it had been attached, a model 4341, had been replaced by AMSCO's acquisition of a model 4381. In late 1983 or early 1984 petitioner was given the opportunity to exchange the IBM 3271 controllers for a 3370 disc unit. On February 1, 1984, petitioner and Equity executed an Exchange *284 Agreement as authorized by the Lease between petitioner and Equity. Pursuant to this Exchange Agreement, the IBM 3271 controllers leased to AMSCO were replaced with an IBM 3370 Direct Access Storage disc unit on lease to the Army Times Publishing Company (Army Times). Equity sought petitioner's agreement to the exercise of its exchange option provision. The predicted residual value of the 3370 Direct Access Storage disc in 1989 was $ 6,000. Petitioner was familiar with the financial condition of the new sublessee Army Times. Petitioner was of the opinion that Army Times was in sound financial condition. Prior to entering the equipment transaction petitioner was informed of the expected income tax consequences it would have. He was informed that during the first 5 years there would be tax losses, but that in the remaining years he would have recognizable taxable income. Based on his experience in the computer industry, petitioner was of the opinion that the residual value of equipment he purchased would be sufficient to cover the difference between his out-of-pocket costs and result in a profit to him. He also was of the opinion that he would be able to re-lease or sell *285 the equipment at the end of the lease term. The difference between the payments due from petitioner under the Installment Note of $ 2,227.04 per month and the rentals due to petitioner under the lease of $ 2,275.04 per month produced a Net Monthly Rental of $ 48. These amounts were paid to petitioner in semiannual or annual payments totaling $ 576 per year for the period from January 1, 1982, through December 31, 1982, through the period January 1, 1985, through June 30, 1985. Petitioner received accounting summaries from Equity for the years ending December 31, 1981, December 31, 1982, and December 31, 1983. In the 1970s the IBM 2305 fixed head disk and the IBM 3330 rotating head disk dominated the disk market. The IBM 2305 had a lower access time and provided a higher input-output rate than the IBM 3330. Because of its performance level the IBM 2305 in late 1981 sold for 50 percent of its 1971 selling price while the 3330 brought less than 10 percent of its 1971 selling price. Many manufacturers other than IBM would identify gaps in the IBM product line and successfully introduce products to fill the need. Intel produced its 3805 and 3815 disks in an effort to compete *286 with the IBM 2305 disk. The Intel 3815 contained a semiconductor memory and thus was substantially faster than the IBM 2305 which had a magnetic memory. The Intel 3815 was introduced in mid-1981 as an entry level version of the Intel 3805. It was less expensive than the 3805 and its users retained an upgrade option to the Intel 3805. The Intel 3815 had a higher performance than the IMB 2305. IBM had no effective disk to compete with either the Intel 3805 or 3815. Petitioner, on his income tax returns, claimed ordinary losses from the leasing activity in the amounts and for the years as follows: 1981
$ 21,000
1982
22,339
1983
20,465
Respondent in his notice of deficiency disallowed the claimed loss with the explanation that petitioners had not established that they were the owners of, had not acquired the benefits and burdens of ownership of, had no depreciable interest in, and had not, in substance, made a true economic investment in said equipment. Respondent further determined under the heading "At Risk Paragraph" that "any promissory notes, guarantees, assumption agreements or similar documents executed by you in relation to alleged purchases of *287 computer equipment are not amounts at risk" within the meaning of section 465. Respondent determined that the entire underpayment of tax for each of the years 1981, 1982 and 1983 was due to negligence within the meaning of section 6653(a)(1) and (a)(2) and that a substantial underpayment of tax for each year was due to a tax motivated transaction under section 6621(d). In the alternative to section 6659 respondent determined an addition to tax under section 6661. ULTIMATE FINDINGS OF FACT (1) Petitioners acquired an ownership interest in the computer equipment with respect to which he claimed losses. (2) Petitioner entered into the computer sale/leaseback transaction with a reasonable opportunity of making an economic profit. (3) Petitioner was "at risk" within the meaning of section 465 with respect to his promissory note and security agreement in the amount of $ 14,400 but was not at risk within the meaning of section 465 as to any part of the installment note in the amount of $ 125,600 at the end of any of the years here in issue. OPINION Respondent's first argument is that petitioner's sale/leaseback transaction should be disregarded in its entirety for income *288 tax purposes because the transaction was a tax avoidance scheme devoid of profit motive and economic substance. Respondent further argues that petitioner's losses on the sale/leaseback transaction are limited by the at-risk provisions of section 465 because, conversion of petitioner's nonrecourse liability to recourse liability by the Amendment to his Installment Note was a device to avoid the at-risk rules and because Equity held an interest other than as a creditor. The issue of the validity for Federal income tax purposes of computer equipment transactions has been before this Court numerous times. The determination in each case is factual. See Larsen v. Commissioner,89 T.C. 1229 (1987) and the cases cited at pages 1252-1253. It is well settled that taxpayers are entitled to structure their business transactions as they see fit even when their motivation is tax reduction, if the form of the transaction reflects its substance, and the transaction is not entered into solely for tax avoidance, Gregory v. Helvering,293 U.S. 465 (1935). Where a transaction has genuine economic substance and conforms with business realities it will be respected *289 for tax purposes. Frank Lyon Co. v. United State,435 U.S. 561, 584-585 (1978). In Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 209 (1983), affirmed on this issue 752 F.2d 89 (4th Cir. 1985), relying on the Frank Lyon Co. case, we held that it is appropriate to disregard a transaction for tax purposes where the record shows that the taxpayer had no business purpose or motivation other than obtaining tax benefits in entering the transaction and that the transaction had no economic substance since under these circumstances there existed no reasonable possibility of profit. Conversely, where either a business purpose or economic substance is present the transaction should not be disregarded. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 209. See also Torres v. Commissioner,88 T.C. 702 (1987); Gefen v. Commissioner,87 T.C. 1471 (1986); Mukerji v. Commissioner,87 T.C. 926 (1986); Packard v. Commissioner,85 T.C. 397, 417 (1985). Where the transaction has economic substance it is not necessary to examine petitioner's subjective *290 motivations to determine a business purpose. Packard v. Commissioner, supra at 417. The determination of whether the transaction has economic substance generally revolves around the anticipated residual value of the equipment at the end of the lease term. In this case respondent argues that a determination of the residual value of petitioner's equipment is irrelevant because of the substitution and deletion provisions of the lease between petitioner and Equity. According to respondent, Equity retained a unilateral right to substitute equipment of acceptable value at the time of the substitution for the equipment leased by petitioner and, in so doing, could disregard petitioner's residual value. Respondent contends, relying on Sun Oil Co. v. Commissioner,562 F.2d 258 (3d Cir. 1977), cert. denied 436 U.S. 944 (1978), that Equity's retention of this substitution right is tantamount to ownership and control. Therefore, respondent contends petitioner is not entitled to any deductions associated with any of the equipment in issue because he is not the true owner for tax purposes. Petitioner challenges respondent's interpretation of the *291 substitution and deletion provisions as being "unilateral" and providing Equity the unfettered ability to exchange leased equipment without regard to either petitioner's agreement or residual value. Petitioner asserts that the terms of the provisions contain language which is inconsistent with respondent's "unilateral" interpretation. In addition petitioner contends respondent's reliance upon Sun Oil Co. v. Commissioner, supra, is misplaced. We find that the facts in Sun Oil are not sufficiently analogous to those in the instant case to cause its conclusion to be of relevance here. The substitution provision retained by Equity was clearly included to protect its end user sublessee AMSCO. The rights retained by Equity were not unilateral but rather, as petitioner argues, subject to identifiable and quantifiable standards. Petitioner's agreement was necessary as to acceptable value, fair market value, and termination value. In fact petitioner did agree with these standards in the Exchange Agreement of February 1, 1984. While both Sun Oil and this case involve substitution provisions, in our view the analogy ends at that point. The two provisions are otherwise *292 so disparate as to make comparison irrelevant. [5]
On the basis of the facts in this case, we conclude that the substitution provision in the Lease between petitioner and Equity does not prevent petitioner from being treated as the owner of the equipment for tax purposes. The next consideration is therefore whether the sale/leaseback *293 transaction had economic substance. Petitioner's equity investment in the transaction was the $ 14,400 evidenced by his Promissory Note and Security Agreement. The projected net rental above the Installment Note payments to be received by petitioner was $ 576 per year for the 8-year lease term or a total of $ 4,608. Consequently, for petitioner to have a reasonable opportunity of an economic profit the anticipated December 1989 residual value of the equipment he leased back to Equity would have to exceed $ 9,792. The residual value estimates ranged from zero dollars, by respondent's expert, to $ 47,700, by one of petitioner's experts. Petitioner testified that based upon his economic analysis of the transaction, a residual value of $ 33,000 could be expected in 1989. A review of the record convinces us that the methodology employed by petitioner's expert produced a more reliable estimate of residual value than that of respondent's expert. In addition we find petitioner's expertise in the computer industry, from both an educational and a professional standpoint, make him more qualified to estimate residual value than an ordinary investor owner and in this case more qualified *294 than respondent's expert. Petitioner's expert was by education and experience very knowledgeable as to value of computer equipment. He was experienced in sales of both IBM and Intel equipment. He had at one time been employed by Intel and was particularly familiar with the Intel 3805 and 3815. His report was well reasoned and was based on facts, some of which we have recited in our findings, which supported his conclusions. Petitioner's expert concluded that the Intel 3815 as of December 1981 would be expected to have a value at the end of December 1989 of at least 35 percent of its original cost. He gave as his opinion a December 1989 residual value for the Intel equipment, as of December 1981, the amount of $ 43,000. [6] Petitioner's expert gave as his opinion a December 1989 value for the IBM 3271's, as of December 1981, of 16 percent of their cost or approximately $ 4,700. We do not consider the opinion of respondent's expert to be helpful for a variety of reasons. First of all his expertise lies not in computer hardware but in software. Furthermore, *295 in 1981 he had neither sold nor leased, as a lessor, computer hardware. He based his value conclusions primarily on the average values shown in six articles he had read. He relied for his determination of value on a number of statements on which he contradicted himself during his testimony. For example, while his expert report stated unequivocably that the value of peripherals was tied to that of the host computer, in his testimony he acknowledged that this was not necessarily true. Similarly, he retracted his statement that all computer equipment depreciated and became obsolete at an equal pace. We find his analysis to be flawed in other respects. Respondent's expert witness did not inquire into the type of host computer utilized by AMSCO for its Intel 3815, erroneously assuming it to be an IBM 3031 CPU when in fact the Intel 3815 was connected to a newer 4341 CPU. Finally, although respondent's expert testified that he tried to obtain a copy of the Blue Book from the publisher, he did not request that information from Equity or Leasing and did not consult either source in making his estimations. Based on all the evidence of record we conclude that as of December 1981 the *296 expected residual value as of December 1989 of the computer equipment purchased by petitioner was at least the amount of petitioner's estimate of $ 33,000. This amount is far in excess of the necessary $ 9,792 required for the transaction to have economic substance. Based upon this finding we conclude that petitioner's sale/leaseback transaction may not be disregarded under the standards of Rice's Toyota World, Inc. v. Commissioner, supra, as merely a tax avoidance scheme devoid of business purpose and economic substance. On the record as a whole we conclude that petitioner entered into the sale/leaseback transaction with a reasonable opportunity of making an economic profit aside from tax savings. AT-RISK PROVISIONS Respondent further contends that petitioner's loss deductions with respect to the sale/leaseback are limited by the at-risk provisions of section 465. [7] This section provides that a taxpayer is at risk for the amount of money and his basis in property contributed to the activity plus borrowed amounts for which he is personally liable or which are secured by property other than property used in the activity, to the extent of the value of the other *297 property. The statute specifically excludes from the "at risk" amounts those amounts borrowed from a person who has an interest in the activity other than as a creditor (section 465(b)(3)), and amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements and similar arrangements (section 465(b)(4)). *298 Respondent in this case contends that petitioner is not at risk with respect to the $ 125,600 Installment Note for several reasons. Respondent first contends that Equity, from which petitioner borrowed the money to purchase the equipment, had an interest in the transaction other than as a creditor within the meaning of section 465(b)(3). Respondent further contends that the conversion of petitioner's nonrecourse Installment Note to a partial recourse liability was a device to avoid the at-risk limitations. Section 1.465-1(b), Prop. Income Tax Regs., provides that a taxpayer's amount at risk will not be increased if the transaction is inconsistent with normal commercial practices or is, in essence, a device to avoid section 465. Section 1.465-4(a), Prop. Income Tax Regs., provides for adjustment of the amount a taxpayer is at risk to "reflect more accurately the amount which is actually at risk" under the facts and circumstances described in section 1.465-4(b) of the Proposed Regs. It is respondent's position that no business reason existed for the partial conversion of the Installment Note from nonrecourse to recourse and no reason existed for the amendment other than petitioners' *299 attempt to comply with the requirements of section 465 without in fact being at risk. Respondent further contends that the limited year-end conversions to recourse of amounts specifically designed to cover the specific years' losses only two weeks before the end of the year generating the losses combined with other provisions of the Amendment clearly show that petitioner had no amount of the Installment Note at risk. Since we agree with respondent that the Installment Note Amendment (Amendment) was a device to avoid the at-risk rules of section 465(b)(4) and that no amount was actually at risk. We will not address respondent's first contention. [8]
*300 First, it should be pointed out that at the end of 1981 the Amendment had not been entered into. Therefore, unless the Amendment should be considered to have retroactive effect, there was no part of the Installment Note at risk at December 31, 1981. Petitioner, while not specifically so stating, indicates that it was understood on December 31, 1981, that the Amendment would be executed at a later date. Petitioner's only basis for this contention is a footnote to the investment analysis furnished to him in connection with his entering into the transaction on December 31, 1981. [9]
In our view, this statement is clearly *301 not an agreement to amend the Installment Note, but rather merely an explanation to petitioner of the tax effect of the non-recourse note. We therefore conclude, without regard to respondent's other arguments, that the only amount petitioner had at risk at December 31, 1981, was the $ 14,400 recourse note. Respondent argues that no business purpose existed for the Amendment and the sole reason the Amendment was executed was an attempt by petitioner to avoid the at-risk provisions without in fact being at risk. Respondent points out that Section 1.465-1(b)[10] and section 1.465-4(a), [11] Prop. Income Tax Regs., prohibit increasing a taxpayer's at-risk amount under such circumstances. Proposed regulations generally have at most the force of an argument advanced by respondent. In Jackson v. Commissioner,86 T.C. 492, 529 (1986), we cited the proposed regulations under section 465 in our consideration of the issue. We agree with respondent that to the extent a purported "recourse" agreement does not place a taxpayer actually at risk of an obligation, the agreement is without substance. Under such circumstances the agreement is merely a device to avoid the at-risk *302 rules with respect to an amount claimed to be at risk and should not be recognized. *303 Petitioner states that the intent of Congress in enacting section 465 was to require taxpayers to incur personal liability or to place other property at risk in their investments before they would be entitled to loss deductions with respect to such portion to their borrowing. Petitioner contends that by agreeing to recourse liability via the Amendment he did exactly what the law required and his actions in this case were "no more a device to avoid the law than is the filing of a properly prepared federal tax return a device to avoid the criminal penalties of I.R.C. section 7201." Petitioners assert that "where petitioner incurred bona-fide, permanent and enforceable recourse liability * * * he did so because it was required as part of his transaction and because Congress required it." Under section 465(b)(2), personal liability is required, inter alia, before borrowed amounts are considered at risk. However, the record here shows that the transaction petitioner entered into did not required recourse liability. This is clear from the fact that all the parties agreed to nonrecourse liability at the time of entry into the transaction. There is no business *304 reason given or consideration shown for the Amendment converting the Installment Note to partial recourse; in fact petitioner does not argue that there was a business reason for the Amendment. Clearly, there was not, and as petitioner in effect admits and the record establishes, the Amendment was entered into solely to attempt to comply with the requirements of section 465. We consider the proper characterization of the Amendment to be a device to avoid the at-risk rules. Based on the record herein we conclude that the Amendment does not reflect normal commercial practice. The Amendment represents just the type of year-end increase in the at-risk amount which calls for close scrutiny. Each yearend "at-risk" increase is accompanied by a yearend decrease when the losses sustained from the activity are claimed. Although no reason was shown for the provisions of the Amendment (signed almost a year after the original documents were executed) for the partial recourse liability except to permit petitioner to avoid the "at-risk" provisions of section 465, the Amendment would not be completely without substance to the extent it did in fact place a personal liability on petitioner. However, *305 in our view, no personal liability was placed on petitioner by the Amendment. There is no consideration shown in the record for the signing of the Amendment by petitioner. The recited consideration is the creditor's reliance on the income from and value of the equipment only for payment of the nonrecourse portion of the note. However, in the original note the creditor had agreed to rely on the equipment lease payments and the equipment only for payment of the full amount of the note. We conclude that there was in fact no consideration for the agreement and therefore it did not in fact place petitioner at risk to any extent with respect to the Installment Note. In two recent cases we have considered whether purported recourse liability was in fact a device to avoid the at-risk rules. In Larsen v. Commissioner, supra, we considered whether the recourse assumption of a previously nonrecourse amount was such a device and in Peters v. Commissioner,89 T.C. 423 (1987), we ruled on the substance of a personal guarantee of a previously agreed upon nonrecourse obligation. In each of these cases, after applying a facts and circumstances analysis we concluded *306 that the transaction was intended to avoid the application of the at-risk limitations. Larsen v. Commissioner, supra at 1275. In Larsen v. Commissioner,89 T.C. 1229 (1987), the taxpayer upon entering his computer sale/leaseback transaction signed recourse and nonrecourse promissory notes for the balance owed to the seller/lessee. In addition, the taxpayer executed assumption agreements whereby he assumed certain obligations of the seller/lessee on a full recourse basis. The assumptions were calculated "to equal the difference between the projected amount of taxable losses during the term of the leaseback to Finalco and the amount of cash and recourse notes invested in the transaction by" the taxpayer. Larsen v. Commissioner, supra at 1240. The assumptions were not signed by either the original lender or the original obligor. We concluded that where the original lender had provided nonrecourse financing secured only by the equipment and the equipment lease without regard to personal liability, and neither the original lender, nor the original obligor, has signed the assumptions that the original obligor, had signed the assumptions *307 that the original lender viewed the equipment and lease "as sufficient security and that the taxpayer's liability for the assumed amount became operative only where Finalco defaulted on the Citicorp note." Larsen v. Commissioner, supra at 1274. Due to the original lender's disinterest in the transaction we also concluded that the assumption agreements "were not consistent with normal commercial lending practices." Consequently, we held that the execution of the assumption agreements served no purpose other than an attempt to satisfy the section 465 requirements. Larsen slip opinion at 70. In Peters v. Commissioner, supra, investors who were limited partners signed personal guarantees with respect to a portion of the partnership's nonrecourse installment obligation to the equipment transaction lender. Each limited partner's personal guarantee provided for an incremental increase in his yearly guarantee amount. The increases were calculated not to exceed the projected distributive share of the partnership losses and investment expense deductions. In total, the guaranteed amounts were substantially less than the partnership's obligation to the *308 lender. In the Peters case, we concluded that the guarantees were -- Far from being primary and direct obligations of the partners to pay the entire debt, the personal guarantees, having in effect been voluntarily given, were at most lagniappe as far as Manufacturers Hanover was concerned. [Peters v. Commissioner, supra at 443.] We also found that the limited partners chose the device of a guarantee "as their means of making an end run around the at risk rules of section 465." 89 T.C. at 443. Consequently they were bound to the consequences of that choice. In the Peters case we based our conclusion on the fact that the limited partners, as guarantors, had a right of subrogation against the partnership and therefore were not personally liable for the portion of the obligation which they personally guaranteed. This is a different basis for concluding that the taxpayers in the Peters case were not at risk within the meaning of section 465 than our basis herein. However, the language with respect to transactions which are devices to avoid the at-risk rules is equally pertinent here. In the instant case we hold that petitioner is *309 not at risk because the Amendment was a device to avoid the at-risk rules and actually placed no enforceable liability on petitioner since the agreement contained in the Amendment was made without consideration. The Amendment provided that two weeks before the end of the year petitioner increased his at-risk amount by converting a portion of his previously nonrecourse obligation to recourse. This increase was then substantially offset with the year-end losses from the activity. Such increases should be carefully scrutinized to determine if a valid business purpose existed for the "at-risk" increase and the claimed "at-risk" amount should not be recognized unless the taxpayer could show that he was in fact personally liable and "at risk" for the purported recourse amount, rather than it being merely a device to avoid the "at-risk" rules. Petitioner argues that he incurred bona fide, permanent and enforceable recourse liability because it was required as a part of his transaction and because Congress required it. However, the transaction here involved did not require recourse liability. On the contrary, all parties agreed to and entered into valid binding contracts in December *310 1981 which provided for nonrecourse liability. Equity obviously was satisfied at that time that the equipment and user-lease provided adequate security for the outstanding obligation. Petitioner had been advised prior to entering into the transaction that he must be "at risk" to claim the tax benefits. However, he initially chose to enter into the agreements on a nonrecourse basis. The record indicates that it was never the intent of the parties that petitioner actually be personally liable for any portion of the Installment Note, but merely to give an appearance of such liability for tax benefits. We discern no business purpose for petitioner's purported agreement to become personally liable on an otherwise agreed upon nonrecourse obligation. We hold that petitioner's gratuitously given recourse liability did not in fact place him "at risk" and is to be disregarded as a device to avoid the limitations of the at-risk rules. We therefore conclude that petitioner's losses from the sale/leaseback transaction are limited to the $ 14,400 recourse obligation. Since we have concluded for the reasons set forth herein that petitioner was not "at risk" on any portion of the Installment *311 Note in any of the years here in issue, we do not reach the issue of whether the provisions of paragraph 2(ii) of the Amendment, allowing petitioner to avoid at-risk liability under specified circumstances, is a stop loss or other similar arrangement within the meaning of section 465(b)(4), or whether Equity possessed an interest other than as a creditor in the transaction. ADDITIONS TO TAX Section 6653(a)(1) [12] provides for an addition to tax equal to 5 percent of the underpayment when any part of any underpayment is due to negligence or intentional disregard of the rules. Section 6653(a)(2) provides for a further addition to tax equal to 50 percent of the interest payable on the underpayment with respect to that part of the underpayment attributable to negligence. Respondent contends that petitioners are liable for both the 6653(a)(1) and (a)(2) additions because the entire underpayment is due to negligence or intentional disregard of rules and regulations. Petitioner argues that no part of any underpayment is due to negligence or intentional disregard of rules or regulations. He argues that he maintained books and records to substantiate most of his claimed business expenses, *312 and that his agreement to certain adjustments "was based upon fatigue and exhaustion in dealing with respondent's agents and his desire to proceed to trial as quickly as possible on the equipment leasing transaction." *313 The burden is on petitioner to show error in respondent's determination of additions to tax under section 6653(a). Bixby v. Commissioner,58 T.C. 757 (1972). We have stated that "for the purposes of this section, 'negligence is lack of due care or failure to do what a reasonable or ordinarily prudent person would do under the circumstances.'" Neely v. Commissioner,85 T.C. 934, 947 (1985), citing Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967). Petitioner has presented no evidence to show that the underpayment resulting from the disallowance of losses under the at-risk provisions of section 465 was not due to negligence or intentional disregard of rules and regulations. Our characterization of the Installment Note Amendment as a device to avoid the at-risk rules calls for a finding of negligence. [13]
We also find the underpayment *314 resulting from petitioner's concessions on deductions is due to negligence or intentional disregard of rules and regulations. Petitioner presented no evidence to support his assertion that he conceded these amounts under fatigue or duress or to advance the remaining issues to trial at an earlier date. Rule 142(a). Accordingly, we find the entire underpayment attributable to negligence or intentional disregard of rules and regulations. Thus, the section 6653(a)(1) 5-percent addition, as well as section 6653(a)(2) addition, are sustained for the entire amount of the underpayment. Section 6621(c)[14] [previously designated section 6621(d) of the Internal Revenue Code of 1954] requires an increased rate of interest on any substantial underpayment which is attributable to tax motivated transactions. The increased rate is 120% of the underpayment rate and is applicable for interest accruing after December 31, 1984. A "substantial underpayment attributable to tax motivated transactions" is an underpayment attributable to one or more tax motivated transactions if the amount of the underpayment is greater than $ 1,000.00. Section 6621(c)(2). A loss disallowed *315 by reason of 465(a) is specifically included in the definition of tax motivated transactions. Section 6621(c)(3)(A)(ii). [15] We have concluded that a portion of the underpayment is attributable to petitioner's losses which are disallowed as a result of the application of section 465. It appears that the disallowance of losses with respect to the sale/leaseback transaction will create an underpayment in excess of $ 1,000.00 so that petitioners are liable for the 6621(c) addition. *316 For taxable years 1982 and 1983 respondent determined petitioner was liable under section 6661 for a 10% addition to tax for the substantial understatement of liability. Section 6661 [16] requires an addition to tax equal to 25 percent of an underpayment attributable to a substantial understatement. [17] The understatement is substantial if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return for that year or $ 5,000. Section 6661(b)(1)(A). For purposes of section 6661(b)(1), an "understatement" is defined as the excess of the tax required to be shown on the return over that actually shown. Section 6661(b)(2)(A). The amount of the understatement will be reduced in some circumstances. The portion attributable to "any item with respect to which the relevant facts affecting the items' tax treatment are adequately disclosed in the return or in a statement attached to the return" or attributable to items for which there is substantial authority for the tax treatment will not be within the understatement subject to the addition. Section 6661(b)(2)(B). Petitioner makes no claims that any portion of the understatement is attributable *317 to facts adequately disclosed or was with respect to tax treatment having substantial authority. However, even if he had so claimed an offset, in the case of tax shelters, special rules limit the applicability of the reduction provisions. We hold that petitioner's Installment Note Amendment with respect to the sale/leaseback transaction falls within the definition of "tax shelter" because it represents an arrangement having as its principal purpose the avoidance or evasion of Federal income tax. [18] Section 6661(b)(2)(C)(ii). Based on the facts in this case, we conclude that any disclosure of facts relevant to the Amendment would not reduce the understatement for purposes of section 6661 and that petitioner could not reasonably have believed that the tax treatment of the sale/leaseback transaction under the provisions of section 465 was more likely than not the proper treatment. We thus hold that petitioner is liable for the section 6661 addition to tax for substantial understatement of liability. [19]
*318 Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Respondent conceded on brief that petitioners were not liable for additions to tax under sec. 6659.↩
*. To be determined. ↩
3. Subsection (d) of sec. 6621↩ was redesignated subsection (c) and amended by the Tax Reform Act of 1986, Sec. 1511(c)(1)(A)-(C), Pub. L. 99-514, 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended. 4. The parties stipulated to this fact. ↩
5. The facts herein are more similar to those in L. W. Hardy Co. v. Commissioner,T.C. Memo. 1987-63↩. In that case in a benefits and burdens analysis we concluded that a substitution provision retained by the lessee was not contrary to the taxpayer's ownership interest. That substitution provision was included to protect the sublessee who was afforded a purchase option in its initial lease with the lessee; substitutions when identical equipment was unavailable had to be made with equipment which increased the value of the taxpayer's portfolio; and before the subject substitutions cold be made the taxpayer was informed of the equipment to be substituted through an amendment to the lease agreement. These factors persuaded us that the substitution provision along with several other factors did not adversely affect the taxpayer's ownership. 6. We note that 35 percent of the $ 96,000 petitioner originally paid for the Intel equipment is only $ 33,600. ↩
7. Section 465 read in pertinent part as follows: (b) AMOUNTS CONSIDERED AT RISK. -- (1) IN GENERAL. -- For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including -- (A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and (B) amounts borrowed with respect to such activity (as determined under paragraph (2)). (2) BORROWED AMOUNTS. -- For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he -- (A) is personally liable for the repayment of such amounts, or (B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property).
No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1). (3) CERTAIN BORROWED AMOUNTS EXCLUDED. -- For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who -- (A) has an interest (other than an interest as a creditor) in such activity, or (B) has a relationship to the taxpayer specified within any one of the paragraphs of section 267(b). (4) EXCEPTION. -- Notwithstanding any other provisions of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. (5) AMOUNTS AT RISK IN SUBSEQUENT YEARS. -- If in any taxable year the taxpayer has a loss from an activity to which subsection (a) applies, the amount with respect to which a taxpayer is considered to be at risk (within the meaning of subsection (b)) in subsequent taxable years with respect to that activity shall be reduced by that portion of the loss which (after application of subsection (a)) is allowable as a deduction. ↩
8. On October 15, 1987, Amicus Curiae filed a "Motion for Leave to File Motion and Brief as Amicus Curiae". In that motion, Amicus Curiae requested the Court to issue a Show Cause order to the parties requiring them to demonstrate why the section 465(b)(4) issues within this case should not be controlled by Barton v. Commissioner, docket No. 20553-85 (hereinafter "Barton") a fully stipulated case awaiting decision as a test case for the St. Joseph Leasing Activity, and why respondent should not concede the section 465(b)(3) issue in this case on the basis which that issue was conceded in Barton. We directed the parties to file any objections to the Motion of Amicus Curiae. In response to that Order respondent filed a notice of no objection to granting the Motion to File Brief as Amicus Curiae but would not agree to this case being controlled by Barton. In that notice respondent stated that he conceded the 465(b)(3) issue for the years 1982 and 1983 but not for the taxable year 1981. Petitioner objected to the section 465(b)(4) issue being determined on the basis of the Barton case. On December 14, 1987 this Court granted the Motion for Leave to File Motion and Brief as Amicus Curiae "to the extent that if the Court reaches the issue under section 465(b)(4) * * * the briefs filed by the parties in the case of Barton, will be read by the Court and given such consideration as the Court determines warranted in deciding the section 465(b)(4) issue" in the instant case. In all other respects the Court denied the Motion for Leave to File Motion and Brief as Amicus Curiae. The argument in the Barton case concerns whether the provision in the amendment entitling the taxpayer to rescind the amendment if the financial standing of the lessee declined was in effect a stop loss agreement relieving the taxpayer from the "recourse" amount of the note. In fact this is stipulated as the only issue in the Barton↩ case. In the instant case a number of other arguments are made. 9. This footnote, as set forth in the facts, states as follows: The at-risk rules limit a taxpayer's loss to the amount that the taxpayer has at risk and could actually lose from an activity. These rules apply to individuals, tax-option corporations and personal holding companies. Accordingly, in order to prevent the at-risk limits from applying to the losses shown, up to $ 83,480 of the non-recourse installment note must be converted to full recourse status in the years 1982 through 1985. This full recourse portion will then fully amortize by 1989. ↩
10. Section 1.465-1(b), Prop. Income Tax Regs., 44 Fed. Reg. 32,239 (June 5, 1979) reads as follows: Section 1.465-1. General rules; limitation of deductions to amount at risk. (b) Substance over form. In applying section 465 and these regulations, substance will prevail over form. Regardless of the form a transaction may take, the taxpayer's amount at risk will not be increased if the transaction is inconsistent with normal commercial practices or is, in essence, a device to avoid the at risk provisions. ↩
11. Section 1.465-4, Prop. Income Tax Regs., reads as follows: Section 1.465-4. General rules; rules regarding attempts to avoid the at risk provisions. -- (a) General rule. If a taxpayer engages in a pattern of conduct which is not within normal commercial practice or has the effect of avoiding the provisions of section 465, the taxpayer's amount at risk may be adjusted to reflect more accurately the amount which is actually at risk. For example, increases in the amount at risk occurring toward the close of a taxable year which have the effect of increasing the amount of losses which will be allowed to the taxpayer under section 465 for the taxable year will be examined closely. If, considering all the facts and circumstances, it appears that the event which increases the amount at risk at the close of the taxable year will be accompanied by an event which decreases the amount at risk after the close of the taxable year, these amounts will be disregarded in determining the amount at risk unless the taxpayer can establish -- (1) The existence of a valid business purpose for increasing and then decreasing the amount at risk; and (2) That the increases and decreases are not a device for avoiding section 465. (b) Facts and circumstances. These facts and circumstances to be considered include -- (1) The length of time between the increase and decrease in the amount at risk; (2) The nature of the activity and deviations from normal business practice in the conduct of that activity; (3) The use of those amounts which increased the amount at risk toward the close of the taxable year; (4) Contractual arrangements between parties to the activity; and (5) The occurrence of unanticipated events which make the decrease in the amount at risk necessary. [44 Fed. Reg. 32,239↩ (June 5, 1979).] 12. Section 6653 read in pertinent part as follows: (a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME, GIFT, OR WINDFALL PROFIT TAXES. -- (1) IN GENERAL. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. (2) ADDITIONAL AMOUNT FOR PORTION ATTRIBUTABLE TO NEGLIGENCE, ETC. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to the negligence or intentional disregard referred to in paragraph (1), and (B) for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax. ↩
13. See Harmon v. Commissioner,T.C. Memo. 1986-305, and Call v. Commissioner,T.C. Memo. 1985-318↩, in which section 6653 additions were sustained in light of the taxpayers' activities in which their principal purpose was the avoidance of income tax. 14. Section 6621(c) reads as follows: (c) INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS. -- (1) IN GENERAL. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection. (2) SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000. (3) TAX MOTIVATED TRANSACTIONS. -- (A) IN GENERAL. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)). (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), and (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and (v) any sham or fraudulent transaction. ↩
15. See Lansburgh v. Commission,T.C. Memo. 1987-491, for application of section 6621(c)↩ to an underpayment resulting from a loss disallowed by reason of 465(a). 16. Section 6661 reads in pertinent part as follows: (1) SUBSTANTIAL UNDERSTATEMENT. -- (A) IN GENERAL. -- For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of -- (i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $ 5,000. (B) SPECIAL RULE FOR CORPORATIONS. -- In the case of a corporation other than an S corporation or a personal holding company (as defined in section 542), paragraph (1) shall be applied by substituting "$ 10,000" for "$ 5,000". (2) UNDERSTATEMENT. -- (A) IN GENERAL. -- For purposes of paragraph (1), the term "Understatement" means the excess of -- (i) the amount of the tax required to be shown on the return for the taxable year, over (ii) the amount of the tax imposed which is shown on the return. (B) REDUCTION FOR UNDERSTATEMENT DUE TO POSITION OF TAXPAYER OR DISCLOSED ITEM. -- The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to -- (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. (C) SPECIAL RULES IN CASES INVOLVING TAX SHELTERS. -- (i) IN GENERAL. -- In the case of any item attributable to a tax shelter -- (I) subparagraph (B)(ii) shall not apply, and (II) subparagraph (B)(i) shall not apply unless (in addition to meeting the requirements of such subparagraph) the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment. (ii) TAX SHELTER. -- For purposes of clause (i), the term "tax shelter" means -- (I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement,
if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. ↩
17. See Pallottini v. Commissioner,90 T.C. 498↩ (1988). Respondent has not asserted an increase and we sustain the addition in the amount determined. 18. See Burwell v. Commissioner,89 T.C. 580, 597↩ (1987). 19. See Harmon v. Commissioner,T.C. Memo. 1986-305↩.