ESTATE OF SAMUEL COHEN, DECEASED, ALAN COHEN AND JOEL COHEN, PERSONAL REPRESENTATIVES AND ESTATE OF ETHEL COHEN, DECEASED, JOEL COHEN, PERSONAL REPRESENTATIVE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Cohen v. Commissioner
Docket No. 10569-86
United States Tax Court
T.C. Memo 1988-584; 1988 Tax Ct. Memo LEXIS 613; 56 T.C.M. (CCH) 936; T.C.M. (RIA) 88584; December 27, 1988
Steven S. Brown and Harvey M. Silets, for the petitioners. Kirk S. Chaberski and *616 Gary F. Walker, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiencies and addition to tax: Year
Deficiency
Section 661 [1] Addition
1980
$ 506,891.13
--
1981
$ 771,147.47
--
1982
$ 198,559.50
$ 19,855.95
Respondent also determined that petitioners were liable for increased interest under section 6621(c). After concessions, the issues remaining for decision concern a sale and leaseback of computer equipment. Specifically, the issues are (1) whether the sale and leaseback arrangement is a sham, (2) whether Samuel Cohen entered into the arrangement with the requisite profit objective, (3) whether a partially recourse note given for the purchase of the computer equipment represented valid indebtedness, (4) whether the partially recourse note and other notes given for the purchase of the computer equipment increased the extent to which *617 Samuel Cohen was "at risk" within the meaning of section 465, (5) whether petitioners are liable for increased interest under section 6621(c), and (6) whether petitioners are liable for addition to tax under section 6661. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners are the estates of Samuel Cohen ("Mr. Cohen") and his wife, Ethel Cohen ("Mrs. Cohen"), who are both deceased. At the time the petition was filed, the estate of Mr. Cohen was being probated in Dade County, Florida, and Mrs. Cohen resided in Miami, Florida. Mr. and Mrs. Cohen filed joint income tax returns for the taxable years in issue. On November 20, 1980, Mr. Cohen attended a meeting in New York and entered into the sale and leaseback arrangement that is the subject of this case. Before that date, Mr. Cohen had invested in a variety of ventures, including real estate, hotels and a bank. The structure of the sale and leaseback arrangement, although somewhat complex, is largely undisputed. Tiger Computer, a division of National Equipment Rental, Ltd. ("Tiger"), sold *618 certain IBM computer equipment to Elmco, Inc. ("Elmco"), for $ 4,627,000. Tiger sold the equipment subject to existing leases with the actual users of the equipment ("end users"). Elmco paid Tiger $ 100,000 cash upon closing and gave Tiger three short-term notes and one long-term note for the balance of the purchase price. The short-term notes had face amounts of $ 200,000, $ 230,000 and $ 117,000, became due on April 15, 1981, January 15, 1982, and January 15, 1983, respectively and bore 10-percent interest. The long-term note had a face amount of $ 3,980,000, was payable in 96 monthly installments and bore 12-percent interest. All of the foregoing notes were nonrecourse. At the same closing, Elmco resold the computer equipment to Mr. Cohen for $ 4,860,000. Mr. Cohen paid Elmco $ 131,000 cash upon closing and gave Elmco three short-term notes and one long-term note for the balance of the purchase price. The short-term notes were recourse and had face amounts of $ 288,000, $ 311,000 and $ 150,000. In essentially all other respects the short-term notes given to Elmco by Mr. Cohen were identical to those given to Tiger by Elmco; the notes had the same maturity dates and bore *619 interest at the same 10-percent rate. Mr. Cohen has since paid the short-term notes. The long-term note given by Mr. Cohen to Elmco had a face amount of $ 3,980,000 and purported to be recourse to the extent of $ 2,743,912. In essentially all other respects, e.g., payment terms and interest rate, the long-term note was identical to that which Elmco gave Tiger. Also at the same closing, Mr. Cohen leased the computer equipment back to Tiger, the original seller, for a term of 96 months ("Tiger lease"). The first 38 monthly rent payments Tiger owed Mr. Cohen under the Tiger lease equaled exactly the monthly installments Mr. Cohen owed under the long-term note given to Elmco (and, necessarily, the installments due under Elmco's long-term note to Tiger). Starting with the 39th rent payment, Mr. Cohen's monthly rent receipt was to exceed his monthly installment to Elmco by $ 3,793. Over the remaining term of the Tiger lease, this "excess" assured Mr. Cohen $ 219,994. The Tiger lease also entitled Mr. Cohen to "supplemental rent" equaling 50 percent of sublease proceeds received by Tiger. Supplemental rent, however, would not begin to accrue until the fifth year of the Tiger lease, *620 starting on November 1, 1984. In fact, some of the leased equipment would not begin to earn supplemental rent until the sixth year of the Tiger lease, starting on November 1, 1985. Whether Mr. Cohen ever would earn supplemental rent depended, in part, upon whether end users of the computer equipment renewed existing leases with Tiger. Each end user lease was due to expire prior to the time Mr. Cohen's right to supplemental rent from the leased equipment commenced. If the end user leases were not renewed and Tiger was unable to locate new end users, the equipment would not generate supplemental rent for Mr. Cohen. Tiger and Mr. Cohen also entered into a "Remarketing Agreement" in which Mr. Cohen appointed Tiger his agent "to sell or lease on behalf of Owner [Mr. Cohen] the Equipment upon the expiration or cancellation, for any reason, of the term of the [Tiger] Lease." Mr. Cohen also agreed that Tiger was to be compensated as follows: In the event Agent [Tiger] locates the purchaser who buys the Equipment after the expiration of the Lease, Agent, as compensation for its services, shall be paid an amount equal to the fair market value of such services * * *. Finally, *621 the Remarketing Agreement also provided that Tiger's agency would terminate upon certain conditions, including the failure of Tiger to locate a purchaser or lessee within four months of the expiration of the Tiger lease. The two sales and one leaseback described above would have resulted in a circular movement of funds: Tiger would have paid monthly rent to Mr. Cohen, who would have paid his monthly installment to Elmco, which, in turn, would have paid its identical monthly installment to Tiger. To avoid the unnecessary transfer of funds, however, the parties named Manufacturers Hanover Trust Company in a "Depository Agreement." Under that agreement, Tiger deposits its rent with the bank. The bank then debits Tiger's account for the rent owed Mr. Cohen and credits Mr. Cohen's account with this payment. Mr. Cohen's account is then debited for the amount he owes Elmco pursuant to the long-term note. Then, Elmco's account is first credited with this payment and then debited, to the extent of that credit, for the amount Elmco owes Tiger pursuant to Elmco's long-term note. Any credit balance in the account of any of the parties is to be paid by the bank within five days of Tiger's *622 deposit of its rent payment. The respective obligations of the parties pursuant to the two sales and one leaseback were secured by various interests. Elmco's obligations to Tiger pursuant to Elmco's three short-term notes and one long-term note were secured by the computer equipment, by Mr. Cohen's three-short term notes, and by a security agreement for Mr. Cohen's long-term note. Mr. Cohen's obligations to Elmco pursuant to Mr. Cohen's three short-term notes and one long-term note were secured by the computer equipment, by Mr. Cohen's lease with Tiger, and by "Collateral Lease Assignments" which gave Mr. Cohen a security interest in rent payments owed to Tiger by end users of the computer equipment. Mr. Cohen's prospects for economic gain from the arrangement depended upon the computer equipment's residual value upon termination of the Tiger lease and the extent of "supplemental rent." If the computer equipment 1) had no residual value at the end of the Tiger lease and 2) failed to generate any "supplemental rent," the sale and leaseback arrangement would produce a $ 743,803 negative cash flow for Mr. Cohen. That pre-tax loss is calculated as follows: Cash Down Payment
$ (131,000)
Principal and Interest on
Short-Term Note due 4/15/81
(301,098)
Principal and Interest on
Short-Term Note due 1/15/82
(348,576)
Principal and Interest on
Short-Term Note due 1/15/83
(183,123)
"Excess" of Rent Receipts from Tiger
Over Payments to Elmco on
Long-Term Note
219,994 $ (743,803)
*623 Elmco presented Mr. Cohen with an offering memorandum which contains an appraisal prepared by Mr. Thomas J. Norris. That appraisal values the computer equipment at its price to Mr. Cohen, $ 4,860,000. The appraisal also predicts a residual value of $ 1,213,000 and total supplemental rent of $ 913,764 (50 percent of $ 26,972 per month from November 1, 1984, through October 31, 1985, and 50 percent of $ 41,774 per month from November 1, 1985, through October 31, 1988). The offering memorandum contains the following caveat regarding Mr. Norris' appraisal: The appraisal represents only its author's best estimate of this probability of future events. No assurance or guarantee of future values is given by any Participant in the Program. The Purchaser is at risk as to the future values and is encouraged to arrive at independent estimates if the Purchaser deems it appropriate to do so. Purchasers should note that, in addition to the appraisal attached as Exhibit J hereto, other appraisals of IBM equipment undoubtedly have been rendered by other appraisers to other parties. * * * Such an appraisal was furnished to the sponsor early in 1980 by Arthur D. Little, Inc. and is available *624 to Purchasers upon request. That appraisal, although not based on rental of the equipment, projects values less favorable to Purchasers than the Appraisal attached hereto. The offering memorandum also contains three separate projections of "Tax and Investment Results For a Purchaser in 70% Tax Bracket." Each projection is based upon one of three different assumptions: (1) no residual value and no supplemental rent, (2) supplemental rent but no residual value, and (3) residual value and supplemental rent. The last projection utilizes Mr. Norris' figures. Under the "worst case" scenario, a pre-tax loss of $ 743,803 and aggregate tax savings of $ 520,662 are projected while under the most optimistic assumptions, a pre-tax profit of $ 1,263,101 is forecast. The intermediate assumptions result in a projected, pre-tax profit of $ 169,601. Mr. Cohen's investigation of the foregoing information presented in the offering memorandum was conducted by Marvin Ribotsky, Mr. Cohen's accountant. Mr. Ribotsky called two friends, one a New York University professor who taught computer science and the other a Miami businessman who sold computer equipment. Both persons had worked for IBM in the *625 past. Mr. Ribotsky spoke to both persons regarding the computer equipment's fair market value, its ability to generate rent and its projected residual value. Mr. Ribotsky did not identify either individual, and neither testified at trial. Mr. Ribotsky's investigation also entailed verifying the mathematical accuracy of the projected "Tax and Investment Results." Mr. Ribotsky did not, however, supply his "advisors" with a list of the equipment to be purchased by Mr. Cohen. No one prepared a written report or letter. Nor did Mr. Ribotsky formally engage the services of his friends. [2]
The offering memorandum also contains a section entitled "Risk Factors." The first two risks mentioned are "1. Income Tax Considerations" and "2. Tax Risk of Failure under the Prime Lease" (referring to the possibility of investment tax credit recapture if Elmco were to repossess the equipment to foreclose its security interest). The sixth risk factor mentioned is "6. Re-Lease Proceeds" (referring to the possibility that Tiger may not be able to re-sublease the equipment after *626 current subleases expire) and the seventh risk factor is "7. Competition and Obsolescence: Residual Value." Negotiations concerning the size and structure of the arrangement had commenced sometime in the spring of 1980 and continued to the closing date. Mr. Cohen inquired about such things as Mr. Norris' qualifications and the solvency of Tiger and the end users. Prior to closing, IBM announced a new central processing unit ("CPU"), the model 3081, and additional equipment was added to Mr. Cohen's "portfolio" of computer equipment to compensate for the decline in used computer prices caused by the announcement. OPINION 1. Profit Objective
We first address respondent's argument that losses attributable to the sale and leaseback arrangement are nondeductible because Mr. Cohen did not enter into the arrangement with the requisite profit objective. The arrangement generated depreciation and interest deductions for the taxable years in issue; while deductibility of the interest payments does not depend upon a profit objective (sections 163(a), 183(b)(1)), depreciation deductions *627 must stem from property used in a trade or business or held for the production of income. Section 167(a); Brannen v. Commissioner,78 T.C. 471, 501 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Whether property is used in a trade or business or held for the production of income, in turn, depends upon the existence of the requisite profit objective. In our most recent opinion addressing the issue, we have stated that the requisite profit objective test of section 183 is satisfied if the taxpayer can prove he "had an actual and honest profit objective for entering into the activity." Levy v. Commissioner,91 T.C. No. 54 (Nov. 2, 1988), slip op., p. 52. Section 183 governs activities not qualifying under sections 162(a) or 212(1) or (2), e.g., those lacking the requisite profit objective. Section 183(c). Section 183, however, can hardly be called a disallowance provision, because it permits deductions not otherwise allowed by sections 162(a), 167(a) *628 or 212(1) or (2). Brannen v. Commissioner,78 T.C. at 500. First, section 183(b)(1) permits those deductions allowable regardless of profit objective, e.g., interest and State and local taxes. Second, section 183(b)(2) additionally permits those deductions which would have been allowable had the activity been engaged in for profit, e.g., depreciation, but only to the extent that gross income from the activity exceeds the deductions allowed by section 183(b)(1). Whether Mr. Cohen entered into the sale and leaseback arrangement with the requisite profit objective is an issue of fact. Flowers v. Commissioner, 80 T.C. at 931-932. On that issue, petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933); Brannen v. Commissioner,78 T.C. at 506. Although they need not demonstrate that Mr. Cohen possessed a "reasonable expectation of profit," petitioners must prove that he entered into the activity, or continued it, with the objective of making a profit. Section 1.183-2(a), Income Tax Regs.
*629 Regulations promulgated under section 183 itemize a number of factors to be considered in determining whether an activity falls within section 183. Sec. 1.183-2(b), Income Tax Regs. Those factors are also relevant in determining whether an activity falls within either section 162 or section 212(1) or (2), as both inquiries focus on the existence of the requisite profit objective. Brannen v. Commissioner,78 T.C. at 507. No single factor is determinative, and all facts and circumstances, including factors not listed, are to be considered. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner,86 T.C. 360, 371 (1986). Based upon all of the facts and circumstances of the instant case, we find that Mr. Cohen entered into the sale and leaseback arrangement without an actual and honest profit objective. Based upon our finding that Mr. Cohen lacked the requisite profit objective, we hold that deductions attributable to the arrangement are allowable only to the extent permitted by section 183. *630 A number of facts demonstrate that Mr. Cohen lacked the requisite profit objective. Pre-Closing Investigation
First, Mr. Cohen conducted only a casual and superficial investigation of the computer equipment's projected residual value and projected supplemental rent, although these items needed to total $ 743,803 in order for Mr. Cohen to "break even." [3] In Brannen v. Commissioner, 722 F.2d at 704-705, a partnership's failure to make an independent valuation of a movie demonstrated a failure to operate in a "businesslike manner," indicating lack of the requisite profit objective. The court cited section 1.183-2(b)(1), Income Tax Regs., which states that conducting an activity in a "businesslike manner" evinces a profit objective. The record in the instant case is bereft of any evidence of a systematic *631 attempt to verify the information presented in the offering memorandum. Mr. Ribotsky simply called two unnamed friends (neither of whom testified) for advice, without supplying them with a list of the equipment Mr. Cohen intended to buy. No one prepared anything in writing, and Mr. Ribotsky's investment in the foregoing investigation apparently consisted of the price of a drink. In sum, the record discloses a casual, unbusinesslike investigation that is inconsistent with a profit-oriented venture. We believe that Mr. Cohen was an astute, experienced businessman. Thus, if his objective had been profit, we believe that Mr. Cohen would have had more circumspect in entering into a $ 4,860,000 deal with a fixed, out-of-pocket loss of $ 743,803 (in the event projections of residual value and supplemental rent did not hold true). We doubt sincerely that Mr. Cohen's investments in real estate, hotels, and a bank were characterized by the same cavalier approach adopted in his computer activity arrangement. The investigation conducted on behalf of Mr. Cohen was especially deficient in view of certain "warning signs" that would have led a profit-oriented investor to "dig deeper." For *632 example, the offering memorandum itself suggests that the Norris appraisal is not "independent," as the memorandum encourages investors to obtain "independent estimates." The offering memorandum also advises investors that a less favorable appraisal prepared by Arthur D. Little, Inc., is available upon request. Thus, not only did Mr. Cohen fail to obtain an independent appraisal, he also turned his back, without explanation, on a less favorable one that was his for the asking. Fair Market Value
Mr. Cohen's lack of the requisite profit objective was further demonstrated by his willingness to purchase the equipment for more than its fair market value. In Brannen v. Commissioner,78 T.C. at 508, we cited a partnership's payment of an excessive price for a movie as evidence of the partnership's lack of the requisite profit objective. As noted, Mr. Norris' pre-closing appraisal values the equipment at its purchase price to Mr. Cohen, $ 4,860,000. Petitioner's expert, F. G. Hap Fisher, prepared a report which also values the equipment at or above that figure on the closing *633 date. Those valuations, however, conflict with that of respondent's expert, Donald W. McEwen. Mr. McEwen values the equipment at $3,585,000 on the pertinent date. His valuation is based upon values appearing in the October 1980 and January 1981 issues of the Computer Price Guide, published by Computer Merchants, Inc. (commonly known as the "Blue Book" and hereinafter referred to as such). Because Mr. McEwen's valuation is based upon an established, objective source, we find it more credible than the valuations of Mr. Fisher and Mr. Norris. In contrast, Mr. Norris valued Mr. Cohen's portfolio by applying a given percentage to the IBM list price of each type of computer equipment which Mr. Cohen purchased. For example, according to the Norris appraisal, Mr. Cohen purchased a number of model 370/148 IBM CPUs with a list price of $ 2,176,651. Mr. Norris determined that on October 31, 1980 (less than one month prior to closing) those items had a fair market value of 46 percent of list price. The October 1980 issue of the Blue Book, however, quotes prices at 15 to 21 percent of list price for computer configurations containing the 370/148. That Mr. Norris disregarded the Blue Book *634 and Mr. Cohen paid more than fair market value for the equipment is further demonstrated by reference to the Blue Book prices of computer equipment purchased by Mr. Cohen while on lease by Tiger to Motorwheel Corporation. Mr. Norris valued that equipment at $ 313,000. Meanwhile, the same essential configuration had an October 1980 Blue Book value of $ 139,000. Actually, because Mr. Cohen purchased the computer equipment in late November, the value of the equipment probably did not even meet the lower figure at closing. Schedules to the purchase agreement between Elmco and Mr. Cohen suggest that the parties apportioned $ 230,058 of the purchase price to the Motorwheel Corporation equipment, but that amount, nevertheless, was still well in excess of fair market value. Similarly, Mr. Norris valued equipment on lease to Baker Perkins, Inc., at $ 157,000, while the October 1980 Blue Book indicates that this equipment was worth $ 93,800. Although schedules to Mr. Cohen's purchase agreement suggest that $ 115,942 of the purchase price was apportioned to the Baker Perkins, Inc., equipment, this amount still exceeds by a good margin the equipment's fair market value on the closing date.
*635 Another indication of the computer equipment's fair market value at closing is the fact that the long-term note given to Elmco by Mr. Cohen was recourse to the extent of only $ 2,743,912. When the principal amount of the short-term notes ($ 749,000), which were all recourse, is added to that amount, we arrive at $ 3,492,912, which approximates Mr. McEwen's estimate of the equipment's value at closing. We do not view this outcome as coincidental. Rather, we believe that Mr. Cohen decided he would not incur personal liability that was unsecured. In other words, because the collateral was worth approximately $ 3.5 million, Mr. Cohen decided that he would obligate himself personally only to that extent. Finally, even if a 15 percent "lease premium" is added to Mr. McEwen's valuation, as suggested by petitioners, Mr. Cohen paid an excessive price ($ 3,585,000 x 1.15 = $ 4,122,750). In sum, we find that Mr. Cohen purchased the equipment for a price exceeding fair market value, evidencing his lack of concern for economic, pre-tax profit. Offering Memorandum
The terms of the offering memorandum presented to Mr. Cohen further illustrate that Mr. Cohen's objective was to secure *636 tax benefits rather than to make a pre-tax profit. An offering memorandum's emphasis of tax benefits is one factor to be considered in determining whether the requisite profit objective is present. Thomas v. Commissioner,792 F.2d 1256, 1260 (4th Cir. 1986); cf. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 93 (4th Cir. (1985), affg. in part 81 T.C. 184 (1983). As stated, the offering memorandum contains three separate projections of "Tax and Investment Results For a Purchaser in 70% Tax Bracket." The first projection assumes no residual value and no supplemental rent. Under this "worst case scenario," the investor is assured of a $ 743,803 pre-tax loss but aggregate tax savings over nine taxable years of $ 520,662. Petitioners argue that Mr. Cohen's objective could not have been tax benefits because under the foregoing scenario the tax benefits would be less than Mr. Cohen's cash loss. Petitioners conveniently ignore the fact that although the aggregate tax benefits would equal $ 520,662, this figure is composed of tax savings *637 of $ 2,614,276 in taxable years 1980 through 1984 and tax liabilities of $ 2,093,614 in taxable years 1985 through 1988. Thus, under the worst case scenario, not only would Mr. Cohen have aggregate tax savings of $ 520,662, he also would enjoy substantial tax deferral benefits. In fact, Mr. Maurice Donsky, attorney for Elmco, acknowledged that "The program itself is really nothing more than a deferral: It's taking deductions in the early years and paying it back to the Government in the later years." Although Mr. Donsky made the foregoing comment while arguing that the arrangement offered no net tax benefit over its full term, the statement illustrates that Elmco, as promoter of the arrangement, viewed the deferral benefit as an important aspect of the arrangement. Our own analysis discloses that Mr. Cohen could accumulate $ 989,438.80 of tax benefits over the term of the sale and leaseback arrangement, assuming a three percent after-tax return on his tax savings [4] and annual compounding of interest. [5] We find that Mr. Cohen could easily recoup his cash outlay from tax benefits. *638 The offering memorandum's strong emphasis of the risk of losing tax benefits also reveals the "selling point" of the investment, as well as the foremost concern of investors such as Mr. Cohen. Residual Value and Supplemental Rent
The unlikelihood that the sale and leaseback arrangement would produce a pre-tax profit further evidences the absence of the requisite profit objective. While we are concerned with Mr. Cohen's subjective intent when he entered into the arrangement, objective facts, such as the probability of profit on that date, are the most convincing evidence of this intent. As stated, in order for Mr. Cohen to profit from the arrangement, the sum of the computer equipment's residual value at termination of the Tiger lease and supplemental rent would have had to exceed $ 743,803, the amount by which Mr. Cohen's cash payments to Elmco exceeded his fixed rent receipts from Tiger. We find that on November 20, 1980, residual value and supplemental rent reasonably could not be expected to exceed $ 743,803. The report of petitioners' expert, Mr. Fisher, states that Mr. Cohen could expect a residual value of $ 870,292 to $ 961,103, as well as supplemental rent of *639 between $ 686,441 and $ 758,697. We have already discussed the appraisal prepared by Mr. Norris. Respondent's expert, on the other hand, found that Mr. Cohen could expect a residual value of only $ 133,700 and that the fair market value of the equipment at the time Mr. Cohen's right to supplemental rent commenced, November 1984, would be $ 607,000. We accept Mr. McEwen's projections and reject those of Mr. Fisher and Mr. Norris for a number of reasons. First, the obvious starting point for projecting future residual value is current fair market value. As noted, both Mr. Norris and Mr. Fisher overstate the computer equipment's value on November 20, 1980. Thus, however valid their respective methodologies for projecting future value may be, they are doomed to failure by an erroneous assumption. Second, Mr. Fisher and Mr. Norris have failed to adequately explain their methodology. As stated, Mr. Norris arrived at his closing date valuation by multiplying the IBM list price of types of equipment by given percentages. Mr. Norris projected future residual value in the same manner, utilizing descending percentages. Notably absent from his appraisal, however, is any indication *640 of the source of those percentages. Mr. Fisher's report justifies his projections by first citing a number of general trends in the computer industry, including delay in the introduction by IBM of new computer families that would replace the models 370/138 and 370/148 CPUs, delays in the introduction of the model 3380 disk drive that would replace the model 3350 disk drive, a declining rate of technological advancement, the failure of IBM competitors to successfully "clone" IBM equipment, as well as IBM's preeminence in the industry and the reliability, availability and serviceability of its equipment. Mr. Fisher follows his general discussion by stating that he projected residual value by decreasing the current value of the equipment by a given percentage each year, 12 to 14 percent for the CPUs. In his testimony, Mr. Fisher stated that the percentages he used came from "established curves." There is some suggestion that the curves may have been established at IBM, although Mr. Fisher's testimony is far from clear on this point, and his report is absolutely silent. If the curves do come from IBM, we view them as less trustworthy than independent analyses such as that prepared *641 by Stanford Research Institute ("SRI") because IBM has an interest in downplaying the future depreciation of its products, while emphasizing their ability to hold value. The optimistic projections of residual value contained in the Elmco offering memorandum and based upon Mr. Norris' opinions are undercut by more objective sources. International Data Corporation ("IDC") is a private marketing research firm. Mr. E. L. Meadows is chief executive officer and founder of Elmco and was principally responsible for compiling the projections in the memorandum upon which Mr. Cohen supposedly relied. According to notes prepared by Mr. Meadows on June 5, 1980, IDC had forecast that the model 370/148 CPU would have a residual value equal to two percent of IBM list price on January 1, 1988. Mr. Meadows' own projection, on the other hand, forecast that the same piece of equipment would retain a residual value of 13 percent of IBM list price on the same future date. Similarly, IDC forecast a residual value of one percent of list price on January 1, 1988 for the model 370/138 CPU, while Mr. Meadows forecast that this model would have a residual value equal to 13 percent of IBM list price on *642 that date. Mr. Meadows admitted that he largely ignored the Blue Book in preparing the Elmco offering memorandum and relied, instead, upon the opinions of Mr. Norris. This testimony contradicts that of Mr. Donsky, Elmco's attorney, who testified that he told Mr. Ribotsky and Mr. Cohen that the Blue Book was the guide most often used to value computer equipment and the one that would be used by Elmco. The materials presented to Mr. Cohen by Elmco disclose that the models 370/138 and 370/148 CPUs were unlikely to have significant residual value upon the expiration of the Tiger lease. In his appraisal, Mr. Norris states, "It has generally taken two to three generations to completely obsolete a previous generation." The SRI report confirms this assessment, indicating that equipment is generally obsolete after it has been replaced by two generations of new technology. Mr. Norris' appraisal then concedes that the models 370/138 and 370/148, which formed a large portion of Mr. Cohen's "portfolio," had already been replaced by one generation of replacement technology, the models 4331 and 4341 CPUs. Of the models 370/138 and 370/148, the offering memorandum states, "These processors *643 were replaced as top-of-the-line computers by the IBM 4331 and 4341 announced in 1978 and currently being delivered * * *. The 4300 series has greater power at a lower price." Thus, residual values of models 370/138 and 370/148 at the expiration of the Tiger lease were, at the least, problematical. We also reject projections of supplemental rent prepared by Mr. Norris and Mr. Fisher. Mr. Norris projects supplemental rent by projecting future fair market value upon the commencement of the right to supplemental rent and then assuming that that value may be recovered, from subleases, within 36 months. We have discussed Mr. Norris' methodology for predicting future value, i.e., applying arbitrary percentages to list price. Because we reject that methodology, as well as Mr. Norris' initial valuation of the equipment, we reject his projection of supplemental rent. We reject Mr. Fisher's projection of supplemental rent for the simple reason that neither Mr. Fisher's report nor his testimony explains how he arrived at that projection. We could assume that Mr. Fisher's projection is based upon his estimates of fair market value on November 1, 1984, and November 1, 1985, when Mr. *644 Cohen would first become entitled to 50 percent of the sublease rent from different end users. Mr. Fisher's report, however, does not even provide those "interim" residual value projections, much less explain the relationship between fair market value on a given date and anticipated supplemental rent. In contrast, Mr. McEwen's projections are fully explained in understandable terms. Mr. McEwen determined the expected market lives of the items purchased by Mr. Cohen and then divided the IBM list prices for those items by their market lives. The resulting figures, according to Mr. McEwen, are each item's annual devaluation. In determining market lives, Mr. McEwen relied upon established, neutral sources. He plotted descending Blue Book prices to establish a slope that would predict market life. Mr. McEwen also consulted the SRI report previously discussed. We have previously cited a SRI report with approval. See Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 205. Although petitioners argue that straight-line projections of value are necessarily flawed, we do not agree. The use of a straight-line does not necessarily produce a lower residual value *645 than does the use of a curve. While a straight-line assumes a constant decline in value, a curve indicates a precipitous decline in value during the earlier years of an item's market life, followed by a levelling, gradual decline in latter years. A curve, therefore, reaches a nominal value for an item at an earlier date. Mr. McEwen disregards items with a residual value of less than four percent of IBM list price. We find that to be entirely appropriate in light of the fact that Mr. Cohen would have had to pay Tiger a commission for remarketing the equipment following the termination of the Tiger lease. Petitioners ask that we ignore that commission and look at gross residual value. The commission, however, does bear on Mr. Cohen's ability to profit. [6]
Although Mr. McEwen did not project supplemental rent, he projected an "interim" residual value of $ 607,000 for the computer equipment upon the commencement of Mr. Cohen's right to supplemental rent in November 1984. Mr. Norris' report suggests that *646 it would take three years to recover that amount through subleases. Because Mr. Cohen had only a 50 percent interest in sublease proceeds, and because he did not have an interest in subleases of the entire portfolio until November 1985, we find it implausible that Mr. Cohen could have received more than $ 303,500 in supplemental rent. In sum, we find Mr. McEwen's projections more credible than those of Mr. Fisher and Mr. Norris because Mr. McEwen is forthright about the basis for his projections and because Mr. McEwen relies upon neutral sources for market information. We note that Mr. Fisher criticized the SRI report and testified to a "silent market" for IBM equipment with prices higher than those reflected in the Blue Book or by IDC. In sum, Mr. Fisher suggests that established, neutral sources should be ignored and, instead, his testimony of "silent markets" and "established curves" should be adopted without any indication of the source of his testimony. We are circumspect to consider expert testimony of "silent markets" that is based upon silent sources. Indeed, such silence is Mr. Cohen's doom (see Milton, Paradise Lost, Book VI, line 385 (1667)). Cf. Witchita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), *647 affd. 162 F.2d 513 (10th Cir. 1947). We therefore reject Mr. Fisher's opinion. Other factors probative of the requisite profit objective or a lack thereof are (1) the taxpayer's expertise ( Brannen v. Commissioner, 722 F.2d at 705; section 1.183-2(b)(2), Income Tax Regs.) and (2) an activity's history of profits and losses ( Brannen v. Commissioner, 722 F.2d at 705; section 1.183-2(b)(6), Income Tax Regs.). The record contains no evidence that Mr. Cohen or any of his consultants had expertise in computer leasing. Mr. Ribotsky had taken computer courses, owned computer equipment and had installed systems for clients, but those facts do not indicate familiarity with the large capacity equipment sold to Mr. Cohen, much less an ability to appraise such equipment or predict its future value. Furthermore, the sale and leaseback arrangement produced losses in each of the taxable years in issue. Petitioners argue that Mr. Cohen engaged in extensive negotiations, evidencing the requisite profit objective. We do not view Elmco's last minute addition of equipment as determinative of *648 such objective. Mr. Norris, in a letter dated November 14, 1980, stated that the IBM announcement caused Mr. Cohen's portfolio to devalue by $ 346,000 and that the additional equipment was worth $ 470,000. We have found, however, that Mr. Norris' appraisal was excessive. The additional equipment consisted of equipment on lease to Motorwheel Corporation and Baker Perkins. As already noted, both sets of equipment were grossly overvalued, the total Blue Book values of that equipment being only $ 232,800. If Mr. Cohen had been concerned with pre-tax profit, he or Mr. Ribotsky would have ensured that the additional equipment fully compensated for the decline in value caused by the IBM announcement. Mr. Ribotsky testified that he did consult the Blue Book after the addition of equipment. If he did and he thereby discovered the discrepancy between Mr. Norris' appraisal and the Blue Book, then Mr. Cohen's willingness to go ahead and close the arrangement in the face of this knowledge would be very strong evidence indeed of a pure tax objective. Despite the duration of negotiations between Elmco and Mr. Cohen, we find that Mr. Cohen failed to obtain the computer equipment at fair *649 market value and that he was largely unconcerned with residual value and supplemental rent, accepting, largely at face value, the projections in the offering memorandum. In sum, the record discloses that Mr. Cohen's objective was tax benefits, not economic profit. Although our finding is based upon the entire record, we emphasize that Mr. Cohen paid a good deal more than fair market value for the computer equipment and that he entered an arrangement with a fixed, pre-tax loss of $ 743,803, without investigating, in a businesslike manner, projected residual value or supplemental rent, despite the fact that profit depended upon these items and despite warnings that would suggest further inquiry. We do not hold that all investors involved in sale and leaseback arrangements must obtain their own appraisals in order to withstand attack on section 183 grounds. [7] The failure to obtain such an appraisal, however, when coupled with other facts such as failure to examine an independent appraisal made available to the investor and payment of an excessive purchase price, will cast serious doubt on a taxpayer's claim of having possessed the requisite profit objective.
*650 We base our finding on the facts before us, while cases cited by petitioners are based upon circumstances peculiar to those cases. Nevertheless, we deem it appropriate to discuss those precedents. In Torres v. Commissioner,88 T.C. 702, 731 (1987), we held section 183 inapplicable, partly because we found that "the expected economic benefits of the transaction significantly outweigh the tax benefits." By contrast, the sale and leaseback arrangement in the instant case offers no reasonable expectation of economic profit, only a pre-tax loss of $ 743,803 coupled with aggregate tax savings of $ 520,662 and a deferral benefit. Gefen v. Commissioner,87 T.C. 1471, 1498-1499 (1986), is likewise distinguishable. In that case, we stated, We agree with respondent that a disparity between projected tax benefits and pre-tax profits is a factor to be considered in determining whether an activity is engaged in for profit within the meaning of section 183. * * * because the record establishes that the partnership's activities presented a reasonable opportunity for very substantial pre-tax profits, a comparison of projected tax benefits with potential *651 profits would further confirm that the partnership's activities were engaged in for profit. [Emphasis supplied.] In the instant case, a comparison of expected pre-tax profits and tax benefits points toward an opposite conclusion. Furthermore, in Gefen v. Commissioner,supra at 1497, we noted the "substantial effort" made by the partnership in investigating the profitability of the sale and leaseback arrangement in issue in that case. In the instant case, the meager investigation conducted on behalf of Mr. Cohen indicates lack of the requisite profit objective.[8]
*652 Although in many cases involving sale and leaseback arrangements we have begun our analysis by considering the sham transaction doctrine, e.g., Larsen v. Commissioner,89 T.C. 1229, 1251 (1987), in the instant case our determination that Mr. Cohen lacked the requisite profit objective produces the same deficiency as a determination that the arrangement is a sham. Under either finding, petitioners would be entitled to deduct any interest paid on the short-term notes. Although the requisite objective was absent, sections 163(a) and 183(b)(1) permit the deduction of the interest. (Interest payments on Mr. Cohen's long-term note, while likewise deductible, are offset by rent payments from Tiger.) If the arrangement were held to be a sham, the interest payments on the short-term notes would remain deductible, while the Tiger lease and Mr. Cohen's long-term note would be disregarded for Federal income tax purposes. Rice's Toyota World, Inc. v. Commissioner,752 F.2d at 95-96; Rose v. Commissioner,88 T.C. 386, 423 (1987). Our decision that deductions attributable to the sale and leaseback arrangement are limited by section 183 *653 also makes it unnecessary to consider respondent's argument that Mr. Cohen's long-term note be excluded from the computer equipment's basis, because petitioners are not entitled to any deductions for depreciation for the taxable years in issue. Similarly, we need not consider the extent to which Mr. Cohen's notes to Elmco increased his "at risk" amount under section 465. As stated, section 183 permits interest deductions in each of the taxable years in issue. By virtue of his cash down payment alone, Mr. Cohen's "at risk" balance was sufficient in each of those years to permit the foregoing interest deductions in excess of rental income. 2. Section 6621(c) Increased Interest
Section 6621(c)(1) provides for an increased interest rate on "any substantial underpayment attributable to tax-motivated transactions." Section 6621 (c)(3)(A) itemizes certain transactions that are deemed to come within the subsection's purview. In section 6621(c)(3)(B), Congress delegated to the Secretary the authority to "specify other types of transactions which will be treated as tax-motivated for purposes *654 of this subsection * * *." Section 301.6621-2T, Q-4, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 50394 (Dec. 28, 1984), brings within section 6621(c) substantial underpayments resulting from disallowances under section 183. Consequently, we hold that petitioners are liable for increased interest under section 6621(c). 3. Section 6661 Addition
Section 6661(a) imposes an addition to tax for the "substantial understatement" of tax liability. Section 6661(b) characterizes an understatement as substantial if it exceeds the greater of 10 percent of the correct tax or $ 5,000. Respondent has determined an addition to tax under section 6661(a) for taxable year 1982. In their briefs, petitioners concede that they are liable for the addition if we accept "any of the positions set forth by respondent" and the resulting understatement meets the statutory threshold. Thus, if the Rule 155 computation which we will direct discloses a "substantial understatement" for that year, respondent may assess the section 6661(a) addition to the underpayment for the year, taking into *655 account withheld taxes and estimated payments. Woods v. Commissioner,91 T.C. 88 (1988). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section and Code references are to the Internal Revenue Code of 1954 as in effect during the relevant years, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. When asked if these friends were paid for their advice, Mr. Ribotsky replied, "I think I bought one a drink."↩
3. Actually, Mr. Cohen needed to realize residual value and supplemental rent in excess of this amount because Mr. Cohen would have to pay Tiger for its services in remarketing the equipment after the termination of the Tiger lease.↩
4. This rate appears amply conservative in view of the fact that on the closing date the section 6621 interest rate (which was then based upon the prime rate) was 12 percent. Rev. Proc. 83-7, 1983-1 C.B. 583↩. 5. The following table illustrates our computation: ↩
Tax Savings/Liability
Tax Benefit Balance
Year
Plus Balance from Prior Year
3% Return
after one year
1980
$  510,300                            $ 15,309   $  525,609   1981
1,402,287 (876,678 + 525,609)        42,068.61
1,444,355.60
1982
2,077,915.60 (633,560 + 1,444,355.60)
62,337.47
2,140,253   1983
2,480,482 (340,229 + 2,140,253)      74,414.46
2,554,896.40
1984
2,808,405.40 (253,509 + 2,554,896.40)
84,252.16
2,892,657.50
1985
2,651,515.50 (2,892,657.50 - 241,142)
79,545.47
2,731,060.90
1986
2,144,048.90 (2,731,060.90 - 587,012)
64,321.47
2,208,370.30
1987
1,550,951.30 (2,208,370.30 - 657,419)
46,528.54
1,597,479.80
1988
989,438.80 (1,597,479.80 - 608,041)  --
--
6. In Hardy v. Commissioner,T.C. Memo. 1987-63↩, a taxpayer's expert discounted residual value by 15 percent to account for the cost of remarketing equipment.
7. Lansburgh v. Commissioner,T.C. Memo. 1987-491↩.
8. Three recent opinions involving Elmco are likewise distinguishable. In Young v. Commissioner,T.C. Memo. 1988-440, we noted that "the parties stipulated that the amount paid by each petitioner for the equipment purchased was its fair market value." We also found that "in most instances where respondent's expert gave an opinion as to residual value of the computer equipment at the termination of the lease, his estimated value fell within the range of values of petitioners' expert witness." Lamb v. Commissioner,T.C. Memo. 1988-501, tracked Young v. Commissioner,supra, in finding the requisite profit objective. Finally, in Cohen v. Commissioner,T.C. Memo. 1988-525↩, we did not discuss the issues of sham transaction or profit objective, as respondent, in that case, conceded that the "purchase/leaseback should be recognized for tax purposes," implicitly acknowledging that the investor was motivated by business purpose. In the instant case, respondent has not conceded the existence of the requisite profit objective. To the contrary, he has offered credible evidence which refutes petitioners' claims respecting fair market value at closing, projected supplemental rent and projected residual value upon lease termination. It also should be noted that in the three cited opinions we held that section 465 limited the deductibility of losses generated by the sale and leaseback arrangements.